# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GINA FIORE; KEITH GIPSON,
     *Plaintiffs-Appellants,*

v.

ANTHONY WALDEN; UNKNOWN
AGENTS OF THE FEDERAL
GOVERNMENT,
     *Defendants-Appellees.*

No. 08-17558

D.C. No.
2:07-cv-01674-
ECR-LRL

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Senior District Judge, Presiding

Argued and Submitted
February 12, 2010—San Francisco, California

Filed September 12, 2011
Amended August 8, 2012

Before: Alfred T. Goodwin, Marsha S. Berzon, and
Sandra S. Ikuta, Circuit Judges.

Order;
Dissent to Order by Judge O'Scannlain;
Dissent to Order by Judge McKeown;
Opinion by Judge Berzon;
Dissent by Judge Ikuta

## COUNSEL

Robert A. Nersesian and Thea Marie Sankiewicz, Nersesian & Sankiewicz, Las Vegas, Nevada, for the plaintiffs-appellants.

Michael F. Hertz, Acting Assistant Attorney General, and Barbara L. Herwig and Kelsi Brown Corkran, Attorneys, Civil Division, Department of Justice, Washington, D.C., for the defendants-appellees.

## ORDER

The opinion, filed on September 12, 2011, is withdrawn and replaced by the amended opinion attached to this order.

With this amendment, the majority of the panel has voted to deny appellee's petition for rehearing. Judge Berzon has voted to deny the petition for rehearing en banc and Judge Goodwin so recommends. Judge Ikuta has voted to grant the petition for rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The majority of the active judges have voted to deny rehearing the matter en banc. Fed. R. App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc are DENIED. Judge O'Scannlain's and Judge McKeown's dissents from denial of en banc rehearing are filed concurrently herewith.

---

O'SCANNLAIN, Circuit Judge, joined by TALLMAN, CALLAHAN, BEA, and IKUTA, Circuit Judges, dissenting from the order denying rehearing en banc:

Due process allows a court to exercise personal jurisdiction over a defendant only if "the defendant's conduct and connection *with the forum State* are such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (emphasis added; internal quotation marks omitted). To meet this requirement in a tort case, a plaintiff generally must show that the defendant "expressly aimed" his tortious conduct at the forum state. *Calder v. Jones*, 465 U.S. 783, 789 (1984).

In this case, the panel majority disregarded that fundamental requirement of due process. It held that a Nevada court

could exercise personal jurisdiction over a defendant for his allegedly tortious conduct in Georgia even though: (1) *all* of the actions forming the basis of the plaintiffs' sole legal claim were taken in and directed at Georgia, and (2) when the defendant took those actions he did not know that the plaintiffs had *any* relevant connection to Nevada.

This ruling clashes with Supreme Court case law, exacerbates a conflict in our circuit law, begets a second intra-circuit conflict, and creates or deepens two lopsided conflicts with other circuits. The panel majority embraced the wrong side of each conflict. As Judge Ikuta recognized in dissent, the panel's holding "threatens a substantial expansion of the scope of personal jurisdiction." 657 F.3d 838, 864. We should have reheard this matter en banc to restore our circuit law and to harmonize it with that of the Supreme Court. I respectfully dissent from the regrettable failure to rehear this case en banc.

I

A gambling trip in San Juan, Puerto Rico, left Gina Fiore and Keith Gipson with some $97,000 in cash. In August 2006 they took their cash to the San Juan airport to fly to Atlanta and then to Las Vegas. 657 F.3d at 842-43.

At the San Juan airport, TSA agents searched Fiore, Gipson, and their carry-on bags. After discovering their $97,000, the TSA agents summoned three DEA agents. Fiore told DEA agent Michael Cuento that she and Gipson had been gambling in San Juan. Fiore and Gipson showed Cuento their California driver's licenses, told Cuento that they had California and Nevada residences, and said that they were returning to the Nevada residences. Cuento let them board the plane but told them they might be questioned later in their trip. 657 F.3d at 843.

When Fiore and Gipson arrived in Atlanta and headed to their connecting gate to Las Vegas, DEA agent Anthony Wal-

den approached them. Fiore and Gipson said they were going
to Las Vegas and showed him California driver's licenses.
After a drug-detection dog alerted at Gipson's bag, Walden
seized all of Fiore and Gipson's cash because he suspected
that it was connected to illicit drug activity. Walden told them
that their money would be returned if they could show that
they had obtained it legitimately. 657 F.3d at 843, 850.

Fiore and Gipson then flew to Las Vegas. They forwarded
to Walden documents substantiating that their money was
legitimately obtained. They allege that, despite this documen-
tation, Walden helped prepare a false probable cause affidavit
to facilitate an action to forfeit their cash to the government.
Walden allegedly submitted the affidavit to the U.S. Attorney
for the Northern District of Georgia. 657 F.3d at 843-44.

The Assistant U.S. Attorney in charge of the case ulti-
mately concluded that the government lacked probable cause
to forfeit Fiore and Gipson's cash. The cash was returned
about seven months after Walden seized it. 657 F.3d at 844.

## II

### A

Fiore and Gipson sued Walden in Nevada under *Bivens*,
alleging that Walden violated their Fourth Amendment rights
when he seized their cash in Georgia. Fiore and Gipson did
not allege that Walden knew that they had relevant Nevada
connections or that Walden directed his conduct at Nevada
when he seized the money. They did not allege, for example,
that they told Walden that they had Las Vegas residences, that
Cuento spoke with Walden, that Cuento told Walden of Fiore
and Gipson's connection to Las Vegas, that Fiore and Gipson
showed Walden any Nevada-issued identification, or even
that Walden later learned of their Nevada residences. *See* 657
F.3d at 861 (Ikuta, J., dissenting). Because Walden's search-
and-seizure conduct was "expressly aimed" at Georgia—and

Walden thus had no contacts with Nevada that are relevant to Fiore and Gipson's one claim—the district court dismissed the complaint for lack of personal jurisdiction.

## B

A divided panel of our court reversed. The panel majority accepted that Walden's seizure of the cash was "expressly aimed" at Georgia and thus could not independently support personal jurisdiction over him in Nevada. 657 F.3d at 849. But the majority believed that "the false probable cause affidavit *aspect* of the case" supported jurisdiction in Nevada. *Id.* (emphasis added). When Walden prepared the allegedly false affidavit, the majority contended, he knew that Fiore and Gipson had "significant connections" to Nevada. *Id.* at 851. The majority hypothesized that Walden by then knew of these "significant connections" because the plaintiffs told him that they were going to Las Vegas, the plaintiffs' funds were allegedly identifiable as originating from and returning to Las Vegas, Walden or someone else ran background checks on the plaintiffs after they returned to Nevada, and Fiore and Gipson sent Walden documents from Nevada. *Id.* at 850-51.

Based on these connections, the majority concluded that Walden "expressly aimed" his conduct at Nevada when he prepared the affidavit. 657 F.3d at 854; *see id.* at 850-51. Although this affidavit-related conduct did not form the basis of Fiore and Gipson's one and only claim—a Fourth Amendment claim based on the seizure at the Atlanta airport—the majority held that such conduct could support the exercise of pendent personal jurisdiction in Nevada over that claim. *Id.* at 858. The panel remanded to the district court to decide whether to exercise pendent jurisdiction over the seizure claim. *Id.*

Judge Ikuta dissented. "As a matter of simple logic," she explained, "a defendant cannot 'expressly aim' an intentional act at a victim's home state if the defendant committing the

action does not even know that the victim has any connection with that state." 657 F.3d at 862. Because Walden did not know of the plaintiffs' ties to Nevada when he seized their cash—and because the seizure forms the basis for the plaintiffs' *only* claim—he could not have expressly aimed his relevant conduct at Nevada. *Id.* at 862-63.

Noting that this should have been "the end of the matter," Judge Ikuta faulted the majority for allowing jurisdiction based on the false affidavit "aspect" of the case. 657 F.3d at 862, 863. The false affidavit was not used to seize the plaintiffs' cash; it was prepared after the seizure, to facilitate a forfeiture action. *See id.* at 861, 863. Thus, Judge Ikuta explained, any affidavit conduct could not support the exercise of personal jurisdiction over the seizure claim because the court could not say, as required by due process, that the seizure claim arose out of or related to Walden's later conduct in preparing the affidavit. *Id.* at 864.

### III

The panel decision conflicts with Supreme Court case law, with decisions of other circuits, and with decisions of our court. We should have taken this case en banc to eliminate those conflicts.

### A

The panel decision conflicts with *Calder v. Jones*, which holds that a court may exercise personal jurisdiction over a tort defendant only if the defendant "expressly aimed" his tortious conduct *at the forum state*. 465 U.S. at 789.

For a court to have specific personal jurisdiction over a non-resident tort defendant, (1) the defendant must have purposefully directed specific activities toward the state forum, (2) the plaintiff's claim must arise out of or relate to those specific forum-related activities, and (3) the exercise of juris-

diction must be reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). In this case, for example, Fiore and Gipson would have needed to establish "that Walden purposefully directed the actions that form the basis of [their] claim to Nevada." 657 F.3d at 862 (Ikuta, J., dissenting). To establish such "purposeful direction," a plaintiff must show that the defendant committed an intentional act, expressly aimed that act at the forum state, and thereby caused harm that the defendant knew would likely be suffered in the forum state. *See Calder*, 465 U.S. at 788-90.

The panel decision stumbles in addressing *Calder*'s express-aiming requirement. In *Calder* the defendants wrote and edited an article that allegedly libeled actress Shirley Jones, who lived and worked in California. Though the article was largely prepared in Florida (where the defendants resided), it was circulated broadly in California. In holding that a California court had personal jurisdiction over the defendants, the Supreme Court emphasized that the defendants had "expressly aimed" their allegedly tortious conduct "at California." 465 U.S. at 789. The defendants had done so by making California "the focal point both of the story and of the harm suffered": the defendants' article "was drawn from California sources" and "impugned the professionalism of an entertainer whose television career was centered in California." *Id.* at 788-89. The defendants' conduct was, in short, "calculated to cause injury to [Jones] in California." *Id.* at 791.

*Fiore* disregards *Calder*'s express-aiming requirement, holding that a Nevada court could exercise personal jurisdiction over Walden even though Nevada is not "the focal point" of the plaintiffs' only tort claim. Indeed, the majority took matters a step further, allowing personal jurisdiction even though Walden did not know of Fiore and Gipson's connections to Nevada when he seized their cash. "[W]hen Walden seized the cash, he knew only that the plaintiffs had California driver's licenses and were headed to Las Vegas." 657 F.3d at

862 (Ikuta, J., dissenting). Walden did not learn of Fiore and Gipson's ties to Nevada until after the seizure was complete. *Id.* Walden simply could not have "expressly aimed" his relevant conduct—the seizure conduct that forms the basis of Fiore and Gipson's one claim—at Nevada. His "conduct and connection with the forum State" are therefore not "such that he should reasonably anticipate being haled into court there." *Burger King Corp.*, 471 U.S. at 474 (internal quotation marks omitted).[1]

B

The panel decision also conflicts with cases in other circuits over how to interpret and to apply *Calder*'s express-aiming requirement. The majority of circuits have held that, under *Calder*, a defendant must expressly aim the conduct forming the basis of the claim *at the forum state*—not just at a known forum resident—before the courts of that state may exercise jurisdiction over the defendant. The Third and Fourth Circuits, for example, have held that a defendant "must 'manifest behavior intentionally targeted at and focused on' the forum for *Calder* to be satisfied." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998) (quoting *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)). The Tenth Circuit has aligned itself with the Third Circuit in concluding that *Calder* requires "that the forum state itself"—not just "a known forum resident"—"must be the focal point of the tort." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1074 n.9 (10th Cir. 2008) (internal quotation marks omitted). The Seventh Circuit has agreed with these courts, noting that *Calder* "made clear" that a defendant must

---

[1] Judge Ikuta has explained, in a compact and cogent way, that the panel decision "threatens a substantial expansion of the scope of personal jurisdiction" and departs from still other Supreme Court decisions affirming that personal jurisdiction "remains a vital part of due process and fair play." *See* 657 F.3d at 864 (Ikuta, J., dissenting). I endorse her analysis without attempting to replicate it.

"expressly aim[ ] its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 445 (7th Cir. 2010). The law of other circuits is in accord. *See, e.g.*, *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010); *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 485-86 (5th Cir. 2008); *Noonan v. Winston Co.*, 135 F.3d 85, 90 (1st Cir. 1998); *United States v. Ferrara*, 54 F.3d 825, 830 (D.C. Cir. 1995); *see also Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1120 (6th Cir. 1994).

The panel majority divided our circuit from these courts by deeming the express-aiming requirement satisfied when (1) all of the defendant's relevant conduct was aimed at Georgia, and (2) the defendant had no knowledge of the Nevada-based effects of his relevant conduct. The panel made the requirements of due process mean something wholly different in our circuit than they do in other circuits. We should have corrected this by taking this case en banc.

C

The panel decision also deepens a conflict in our own circuit over how to interpret and to apply *Calder*'s express-aiming requirement.

Even before the panel decision here, our circuit had not always been precise when developing our jurisprudence under *Calder*. Some of our decisions have emphasized that under *Calder* a defendant must expressly aim his conduct at the forum, not just at a forum resident. *See, e.g.*, *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1158 (9th Cir. 2006) (defendant's conduct must be "directed at" forum state); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 807 (9th Cir. 2004) (personal jurisdiction lacking in California because Ohio defendant's "express aim was local," not at California). But other decisions have suggested that a defendant may sat-

isfy the express-aiming requirement just by targeting a known forum resident. *See, e.g.*, *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001) (personal jurisdiction in Nevada proper because defendant's allegedly tortious conduct "individually targeted" plaintiffs, who defendant "knew were Nevada residents" (internal quotation marks omitted)); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (express-aiming requirement satisfied when "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state").

This tension in our circuit law was cemented into a square conflict in *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124 (9th Cir. 2010), which upheld the exercise of personal jurisdiction because the defendant's allegedly tortious conduct individually targeted the plaintiff (a resident of the forum), even though the defendant did not expressly aim his conduct at the forum. *See id.* at 1129-30. This holding prompted a dissent calling out the majority for "disregard[ing] controlling circuit authority" requiring "conduct directly targeting the actual forum in question." *Id.* at 1132, 1133 (Reinhardt, J., dissenting) (internal quotation marks omitted). As the dissent explained, "*Pebble Beach* and *Schwarzenegger* establish that knowledge of the plaintiff's residence and a foreseeable harm to the plaintiff are, standing alone, insufficient to establish express aiming." *Id.* at 1134.

In this case the panel majority went even further than did the panel majority in *Brayton Purcell*. Until now, our cases at least recognized that a defendant must know about the plaintiff's forum connections when he took the actions forming the basis of the plaintiff's claims. *See, e.g.*, *Myers*, 238 F.3d at 1073 (defendant "knew [the plaintiffs] were Nevada residents"); *Bancroft & Masters, Inc.*, 223 F.3d at 1087-88. This was still clear after *Brayton Purcell*, where the defendant's sole forum connection was his knowledge of the plaintiff's residence. 606 F.3d at 1135 (Reinhardt, J., dissenting).

But the panel majority here abandoned even this requirement. By allowing personal jurisdiction when a defendant did not even know that the plaintiff was connected to the forum, the panel took circuit law even further from Supreme Court case law than it was before. This should have been corrected en banc.

IV

The panel majority seemed to recognize that if it just applied *Calder*, it would have had to affirm. Instead it waded into pendent personal jurisdiction law, with regrettable results.

Under the doctrine of pendent personal jurisdiction, a defendant may be required to defend against "a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). The doctrine rests on considerations of "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties." *Id.* at 1181.

But the doctrine does not jettison the requirements of due process. To exercise the doctrine, a court must actually possess jurisdiction over at least one claim. This requirement satisfies the fundamental fairness concerns that counsel against haling a defendant into court in a foreign forum. Once that connection to the forum is made and "a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts." *Action Embroidery*, 368 F.3d at 1181. But it is not reasonable —it violates due process—to make a defendant answer to a "pendent" claim when the court does not have jurisdiction over a single claim at all. We have therefore authorized appli-

cation of this doctrine only when the district court has personal jurisdiction over at least one claim. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011); *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004); *Action Embroidery*, 368 F.3d at 1181. *Fiore* breaks from this authority and creates a conflict in our circuit law.

Because personal jurisdiction is analyzed by claim, other circuits have authorized pendent personal jurisdiction when the plaintiff has alleged at least one actual *claim* giving rise to personal jurisdiction. By failing to respect those bounds of pendent personal jurisdiction—and relying instead on a non-claim "aspect" of the case—the panel's ruling divides us from at least seven other circuits. *See United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002) ("Pendent personal jurisdiction . . . exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim."); *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1362 (Fed. Cir. 2001); *Robinson Eng'g Co. Ltd. Pension Plan & Trust v. George*, 223 F.3d 445, 449 (7th Cir. 2000); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 628-29 (4th Cir. 1997); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993); *Oetiker v. Jurid Werke, G. m. b. H.*, 556 F.2d 1, 4-5 & n.10 (D.C. Cir. 1977); *Robinson v. Penn Cent. Co.*, 484 F.2d 553, 555-56 (3d Cir. 1973).

We should have reheard this case en banc to restore our circuit law on pendent personal jurisdiction and to bring it back in line with the decisions of other circuits.

V

It is rare that a panel of this court departs as substantially from controlling law and generates as many conflicts as the

panel did in this case. The panel's holding breaks from binding authority, substantially broadens personal jurisdiction, and creates needless uncertainty in cases involving conduct that may have effects in places that defendants cannot reasonably predict. We should have set the law right.

I respectfully dissent.

McKEOWN, Circuit Judge, with whom Judges GOULD, TALLMAN, CALLAHAN, BEA, IKUTA, and N.R. SMITH join, dissenting from the order denying rehearing en banc:

With the stroke of a pen, our circuit returns to a discredited era of specific personal jurisdiction, where foreseeability reigns supreme and purposeful direction is irrelevant. That approach was, of course, rejected in *Burger King Corp. v. Rudzewicz*; the Supreme Court was unequivocal that "foreseeability is not a sufficient benchmark for exercising personal jurisdiction." 471 U.S. 462, 474 (1985). Instead, the Due Process Clause requires that before a distant state exercises specific jurisdiction over a defendant, the defendant must purposefully direct activities at forum residents resulting in injuries arising out of or relating to those activities. Under the majority's construct, mere knowledge of the potential out-of-state plaintiff's residence, along with a wrongful act, confers specific personal jurisdiction. This virtually limitless expansion of personal jurisdiction runs afoul of both due process guarantees and Supreme Court precedent.

A bare recitation of the facts reveals just how tenuous the forum (Nevada) connection is—individuals traveling to Nevada with California drivers' licenses had their Puerto Rico gambling winnings seized while in transit in Georgia. Drug Enforcement Administration agent Anthony Walden confiscated $97,000 in gambling winnings from Gina Fiore and Keith Gipson at the Atlanta airport. Walden told them that the

money would be returned if they could demonstrate it was legitimately obtained. Upon arriving in Nevada, Fiore and Gipson provided Walden with evidence that the money constituted legitimate gambling winnings. The Assistant United States Attorney ultimately agreed, and the money was returned seven months after it was seized. *Fiore v. Walden*, 657 F.3d 838, 843-44 (9th Cir. 2011).

In their complaint, Fiore and Gipson claim that Walden provided a false probable cause affidavit to the Assistant United States Attorney to support forfeiture proceedings. *Id.* They do not allege that Walden knew of their Nevada residence at the time of the seizure, a difficult claim to make since they presented California drivers' licenses. A close reading of the complaint shows they do not allege Walden knew of their Nevada residence even after the seizure. Because the allegations actually in the complaint are hardly sufficient to show express aiming, the panel opinion refers to "strong" indications that Walden came to know of Fiore and Gipson's Nevada residence after the initial taking, but before he prepared the allegedly misleading affidavit. *Id.* at 850. But even in their brief on rehearing, Fiore and Gipson equivocate, saying that "all indications" showed they "were not Georgia residents, and *likely* residents of Nevada *or* California" (emphases added).

A divided panel of our court held that Walden's preparation of the affidavit for the Assistant United States Attorney, with knowledge of Fiore and Gipson's residence, was sufficient purposeful direction at Nevada to sustain specific personal jurisdiction over Walden. *Id.* at 860. Dissenting, Judge Ikuta correctly recognized that purposeful direction requires more than simply alleging that "the defendant knew [plaintiff's] home state and subsequently engaged in some wrongful act." *Id.* at 864 (Ikuta, J., dissenting).

The purposeful direction requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of

random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475 (internal quotation marks omitted). Therefore, "'single or occasional acts' related to the forum may not be sufficient to establish jurisdiction if 'their nature and quality and the circumstances of their commission' create only an 'attenuated' affiliation with the forum." *Id.* n.18 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)).

Disregarding these constitutional limitations, the panel majority seizes upon a single act—Walden's affidavit, which ironically is not part of the district court or appellate record. For Nevada to constitutionally exercise jurisdiction over Walden based on the affidavit, he would need to be a "primary participant[ ] in an alleged wrongdoing intentionally directed at a [Nevada] resident." *Calder v. Jones*, 465 U.S. 783, 790 (1984). According to the complaint, Walden submitted a probable cause affidavit to a United States Attorney in Georgia regarding Puerto Rico gambling winnings seized in Atlanta. The affidavit was ostensibly aimed at continued retention of confiscated funds that Fiore and Gipson simply requested be returned to Nevada. Nevada was neither a "focal point" nor relevant to the affidavit. *Id.* at 789. Since Fiore and Gipson's state of residence was both irrelevant and unknown during the initial taking, later knowledge of the potential forum state did not somehow alter the express aim of Walden's affidavit; the affidavit remained related to retention of funds seized in Georgia. Fiore and Gipson's state of residence remained irrelevant.

Asserting personal jurisdiction over Walden broadens the specific jurisdiction test from one requiring targeted "express aiming" to one where any attenuated foreign act with foreseeable effects upon a forum resident confers specific jurisdiction. To reach this result under controlling case law, the panel majority sidesteps Walden's contacts with Nevada, concluding instead that "Walden expressly aimed his actions at peo-

ple and property he knew from the outset were *not* local." *Fiore*, 657 F.3d at 850. The leap from knowing someone is "not local" to expressly aiming at *Nevada* is hard to divine.

This approach turns jurisdictional principles inside out. Under the touchstone "minimum contacts" requirement, even though "it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts . . . the Court has consistently held that this kind of foreseeability is not a sufficient benchmark for exercising personal jurisdiction." *Burger King*, 471 U.S. at 474 (internal quotation marks omitted); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (rejecting "the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction.").

Notably missing in the majority's expansive new standard is a limiting principle. Only a wholesale expansion of the personal jurisdiction doctrine to mimic pre-*Palsgraf* tort standards would allow Nevada jurisdiction over Walden. *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928) (limiting foreseeability doctrine in tort). Walden could not have known or even reasonably foreseen that airing his views to a Georgia prosecutor regarding proceeds seized in Atlanta from a transient airport passenger were somehow expressly aimed at the voyager's home state. Yet, what is not even foreseeable in modern-day tort is now "purposeful direction" in our circuit.

Reasonableness is the foundation of personal jurisdiction. *Burger King*, 471 U.S. at 477-78. For a defendant to "reasonably anticipate" out-of-state litigation, it is "essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (citing *Int'l Shoe*, 326 U.S. at 319). If due process lim-

itations on personal jurisdiction are to retain any guiding force, purposeful direction may not be collapsed into a diluted version of foreseeability. Because nothing is reasonable about returning to the unhinged, freeform foreseeability standard rejected by *Burger King* and *Calder*, I respectfully dissent from the order denying rehearing en banc.

---

## OPINION

BERZON, Circuit Judge:

Federal law enforcement officers seized funds from passengers who were temporarily in the Atlanta airport changing planes. The travelers, Gina Fiore and Keith Gipson, explained that the funds were legal gambling proceeds, not evidence of drug transactions. Their story turned out to be true. Fiore and Gipson claim the seizure and later efforts to institute forfeiture proceedings were unconstitutional. They sued in Las Vegas, where they were heading, lived at least part time, and suffered the inconvenience of arriving with absolutely no money, as well as other financial injuries. The district court dismissed this *Bivens*[1] action against the federal officers for lack of personal jurisdiction. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July and August of 2006, Fiore and Gipson, professional gamblers, traveled from Las Vegas, Nevada, where both maintained residences, to casinos in Atlantic City, New Jersey, and San Juan, Puerto Rico, before returning to Las Vegas.[2]

---

[1]*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).

[2]The facts are taken from Fiore and Gipson's first amended complaint and from a declaration by the defendant. Of course, at this preliminary stage, we do not know whether any of the facts alleged in the complaint are true, but simply assume that they are. *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

On their return trip on August 8, 2006, they left from San Juan, boarded a connecting flight in Atlanta, Georgia, and then flew to Las Vegas, their final destination.

In San Juan, an agricultural x-ray inspection and other additional screening showed no contraband in Fiore's or Gipson's luggage. At a Transportation Security Administration (TSA) checkpoint, Fiore and Gipson were subjected to heightened security procedures because they were traveling on one-way tickets. They were screened for minute traces of illegal drugs; none was found. Search of their carry-on bags revealed approximately $48,000 in Gipson's carry-on bag and $34,000 in Fiore's carry-on bag, all carried openly. Gipson also had approximately $15,000 on his person. These funds, totaling approximately $97,000 in United States currency, included approximately $30,000 in seed money for gambling — their "traveling bank" — brought with them from Las Vegas.[3]

After this cash was discovered, San Juan Drug Enforcement Administration (DEA) Agent Michael Cuento and two other agents arrived and questioned Fiore. Gipson was not questioned directly, but stood by and participated in the conversation. Fiore explained that she and Gipson had been staying and gambling at the El San Juan Casino property. When asked for identification, Fiore and Gipson showed their California drivers' licenses and stated that they had California residences, as well as residences in Las Vegas.[4] They further informed the DEA agents "that Las Vegas was the final destination of most if not all of the funds in their possession" and that they were returning to their Las Vegas residences. Agent Cuento escorted Gipson and Fiore to their plane and told them that they might be questioned further in Las Vegas. The two

---

[3]The first amended complaint notes that "Las Vegas [w]as the ordinary static place where [the 'traveling bank' was] situated."

[4]According to the complaint, Fiore's and Gipson's residences in Las Vegas are now their permanent residences.

therefore called their attorneys in Las Vegas and arranged to meet them at the airport.

When they arrived at the Atlanta Hartsfield-Jackson International Airport for their connecting flight to Las Vegas, neither Gipson nor Fiore left the transit area near the departure gates. At their gate, DEA Agent Anthony Walden and another DEA agent approached Fiore and began questioning her. Fiore said again that she was not carrying contraband, weapons, or drugs. She explained that she and Gipson were professional advantage gamblers[5] and that the money in their possession was their gambling bank and winnings. In addition, Fiore showed Walden her trip record,[6] which dated back to July 10, 2006, and listed casinos and gaming results. Gipson, sequestered from Fiore for questioning, explained that the documents evidencing that his trip was for gambling were in his checked bag.

After about ten minutes of questioning, another DEA agent arrived in the boarding area with a drug-detecting dog. The dog did not react to Fiore's carry-on bag but pawed Gipson's bag once. The agents informed Fiore and Gipson that the dog's reaction sufficiently signaled contraband to indicate that their money was involved in drug transactions and then seized *all* the funds that Fiore and Gipson had in their possession. Although Fiore and Gipson asked to be allowed at least taxi fare for their arrival in Las Vegas, the agents denied the request. Walden told Fiore and Gipson that if they later produced receipts showing the legitimacy of the funds, their money would be returned. With this understanding, Fiore and Gipson boarded their flight to Las Vegas. When they arrived

---

[5]Fiore and Gipson's complaint states that they play "advantage gambling," meaning that they limit their play to legal games, such as poker, in which they have a statistical edge over the casino or other competitors because of their skill.

[6]The complaint explains that "[s]uch logs are kept by professional gamblers as support for tax purposes."

in Las Vegas, Fiore and Gipson learned that their checked luggage also had been searched in Atlanta.

On August 30, 2006, and September 15, 2006, Fiore and Gipson sent Walden, from Las Vegas, various documents showing the legitimacy of their funds, including federal tax returns demonstrating that they were professional gamblers; the itinerary, hotel records, and receipts from their trip, which showed the legitimacy of their seized money; and a win record on El San Juan Casino letterhead stationery stating that Gipson left the hotel with over $30,000 in winnings immediately before leaving for Las Vegas via Atlanta. Fiore and Gipson asked that their money be returned to them as Walden had promised.

The funds, however, were not returned to Fiore and Gipson. Instead, the matter was forwarded to DEA headquarters in Virginia for additional investigation.[7] According to the complaint, the DEA's background searches on Fiore and Gipson showed them to be "squeaky clean." Nonetheless, according to the complaint, Walden and another DEA agent provided a false probable cause affidavit to the United States Attorney in the Northern District of Georgia, to assist in bringing a forfeiture action. Specifically, Fiore and Gipson allege in the complaint that this probable cause affidavit falsely stated that Gipson had been uncooperative and had refused to respond to questions; that Fiore and Gipson had given inconsistent answers during questioning; and that there was sufficient evidence for probable cause to forfeit the funds as drug proceeds. Also, according to the complaint, Walden left out exculpatory evidence he knew about when he submitted the affidavit: that Fiore and Gipson had no history of unlawful drug use or

---

[7]In his declaration, Walden states that after he seized the cash, he "immediately transferred [it] to a secure location designated to store seized cash" and that "[w]ithin approximately one hour of the seizure, [he] was no longer in possession of the seized cash . . . [and] did not possess the authority to return the cash" to Fiore and Gipson.

trade; that they had documentation showing them to be advantage gamblers; that their bags had passed through an agricultural x-ray and other inspections used for contraband detection without incident; that Fiore and Gipson had provided actual receipts for most of the funds that they carried; and that the $30,000 Gipson was carrying could be traced directly to a legal source, his winnings at El San Juan Casino.

The case was referred to Assistant United States Attorney (AUSA) Dahil Goss. After determining that Walden had in fact omitted information, with the result that the probable cause affidavit he provided was misleading, Goss concluded that there was no probable cause for the forfeiture of the funds. Goss contacted Fiore and Gipson and offered to return their funds in exchange for a release, presumably of any possible legal claims, but they refused to execute one. Nonetheless, Goss directed the DEA to return Fiore and Gipson's money. The $97,000 was returned to them in Las Vegas on March 1, 2007, nearly seven months after the seizure at the Atlanta airport and six months after Fiore and Gipson had provided Walden with the requested documentation showing the legal source of their funds.

Fiore and Gipson brought a *Bivens* action in the District of Nevada against Walden and three other, unnamed DEA agents or attorneys[8] in their individual capacities, alleging that Walden and the other agents had violated their Fourth Amendment rights by: (1) seizing their money without probable cause; (2) continuing to hold the funds for nearly six months after receiving information conclusively demonstrating the legal source of the cash; (3) knowingly compiling a false and misleading probable case affidavit to support a forfeiture action; and (4) referring the matter to the United States Attorney for prosecution on the basis of deficient and/or falsi-

---

[8]The unnamed DEA agents or attorneys were never served and are not appellants here.

fied information, while willfully withholding known exculpatory information.

Walden moved to dismiss for lack of personal jurisdiction, under Fed. R. Civ. P. 12(b)(2), and for improper venue, under Fed. R. Civ. P. 12(b)(3). The district court determined that Walden's search of Fiore's and Gipson's bags and initial seizure of their funds occurred in, and was expressly aimed at, Georgia. Therefore, the district court concluded, there was not personal jurisdiction over Walden in Nevada.[9] The district court did not separately consider whether Walden's actions regarding the allegedly false probable cause affidavit justified personal jurisdiction.

On appeal, Fiore and Gipson challenge dismissal of their case for lack of personal jurisdiction over Walden, the only defendant-appellee. They also argue that Nevada is the appropriate venue. We review de novo a district court's rulings on personal jurisdiction and improper venue. *Brayton Purcell*, 606 F.3d at 1127.

## II.   DISCUSSION

### A.   Personal Jurisdiction

[1] "'When subject matter jurisdiction is premised on a federal question, a court may exercise specific jurisdiction over a defendant if a rule or statute authorizes it to do so and the exercise of jurisdiction comports with the constitutional requirement of due process.' " *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1072 (9th Cir. 2001) (quoting *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 589 (9th Cir. 1996)). Where, as here, there is no applicable federal statute governing personal jurisdiction, we look to the law of the state in which the district court sits. *See* Fed. R. Civ. P. 4(k)(1)(A).

---

[9]The district court did not address venue.

**[2]** Nevada's long-arm statute permits personal jurisdiction over a defendant unless the exercise of jurisdiction would violate due process. *Myers*, 238 F.3d at 1072; *Trump v. Eighth Judicial Dist. Court*, 857 P.2d 740, 747 (Nev. 1993); Nev. Rev. Stat. 14.065(1). Our analysis therefore focuses exclusively on due process considerations. The due process analysis, in turn, centers on whether Walden has "certain minimum contacts" with Nevada, such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

Our court uses a three-part test (the *Schwarzenegger* test) for determining specific personal jurisdiction — that is, personal jurisdiction premised on the particular circumstances underlying the lawsuit sought to be litigated:[10]

> (1) The non-resident defendant must *purposefully direct his activities* or consummate some transaction *with the forum or resident thereof*; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's *forum-related activities*; and

> (3) the *exercise of jurisdiction* must comport with fair play and substantial justice, i.e. it *must be reasonable*.

---

[10]There is no general jurisdiction over Walden, as he had no "continuous and systematic . . . contacts" with Nevada. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

*Schwarzenegger*, 374 F.3d at 802 (citation and internal quotation marks omitted) (emphases added).

## B.   Operative Facts

In response to Fiore and Gipson's first amended complaint, Walden moved to dismiss for lack of personal jurisdiction and improper venue. His motion included a declaration stating that he was a police officer for the City of Covington, Georgia, and was deputized as a federal narcotics investigator assigned to the DEA Task Force Group 1 at the Atlanta airport. The purpose of the task force was to interdict illegal drugs, seize the drugs and any proceeds found, and prosecute individuals transporting illegal drugs or drug proceeds. Walden also stated that (1) he is a Georgia resident who had never resided, owned property, conducted business, or even been in Nevada; (2) he intercepted Fiore and Gipson at the Atlanta airport after he was informed by San Juan law enforcement officers that Fiore and Gipson had boarded a plane to Atlanta en route to their final destination, Las Vegas, Nevada; (3) when he asked plaintiffs for identification, they presented drivers' licenses that "were not issued by the State of Nevada"; (4) after the seizure, Walden and the other DEA agents "immediately transferred the seized cash to a secure location" for storage; (5) "[w]ithin approximately one hour of the seizure, [Walden] was no longer in possession of the seized cash"; and (6) Walden "did not possess the authority to return the cash to [Fiore and Gipson] once it was seized."[11] Walden stated that he seized the funds because of concern that Fiore and Gipson had approximately $97,000 in their posses-

---

[11]Federal regulations confirm that Walden did not have legal authority to return the money seized from Fiore and Gipson. *See* 21 C.F.R. §§ 1316.72-1316.73 (detailing requirements for storage of property "subject to seizure" and specifying Special Agents-in-Charge — not deputized local police such as Walden — as the officials "designated . . . to receive and maintain" seized property); *see* 21 C.F.R. § 1316.71(e) (defining "Special Agents-in-Charge" as DEA Special or Resident Agents-in-Charge and Federal Bureau of Investigation Special Agents-in-Charge).

sion and lacked sufficient documentation to substantiate the legitimacy of the funds. He further declared that he did not contact Fiore and Gipson's attorney or anyone else in Nevada to verify their explanations about the sources of the funds.

The district court did not conduct an evidentiary hearing regarding personal jurisdiction.[12] Consequently, "the plaintiff need only make 'a prima facie showing of jurisdictional facts to withstand the motion to dismiss.' "[13] *Brayton Purcell*, 606 F.3d at 1127 (quoting *Pebble Beach*, 453 F.3d at 1154). " '[U]ncontroverted allegations in plaintiff's complaint must be taken as true,' " *id.* (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002)) (alteration omitted), and, in deciding whether a prima facie showing has been made, "the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach*, 453 F.3d at 1154. Nonetheless, "mere 'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007).

**[3]** In determining whether there is personal jurisdiction, we have drawn inferences from the facts alleged in the complaint, but have not expressly addressed the standard for doing so.[14] Other circuits have been more explicit than we have

---

[12]As far as appears in the record, Walden did not request an evidentiary hearing.

[13]"If the plaintiff succeeds in meeting that prima facie burden, then the district court may still order an evidentiary hearing or the matter may be brought up again at trial." *Metropolitan Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990).

[14]*See CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111 (9th Cir. 2004) (holding that it is "reasonable to infer" that the defendant knew its actions "would resonate in Arizona" because it knew that plaintiff was based in Arizona); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1320 (9th Cir. 1998) (holding that licensing agreements and other documents with California companies "g[a]ve rise to a strong inference" that defendants conducted negotiations with California companies, possibly in California).

about the authority to draw reasonable inferences in favor of the plaintiff in determining whether the plaintiff has made a prima facie showing of personal jurisdiction over the defendant.[15] At the same time, the federal courts of appeal do not draw unreasonable or far-fetched inferences in favor of the plaintiff.[16]

---

[15]*See Noonan v. Winston Co.*, 135 F.3d 85, 89 (1st Cir. 1998) ("Because the district court dismissed plaintiffs' claims without holding an evidentiary hearing, we review the rulings *de novo*, . . . construing all inferences in the plaintiffs' favor."); *New Wellington v. Flagship Resort Dev.*, 416 F.3d 290, 294 (4th Cir. 2005) ("[C]ourts 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.' " (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989))); *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 535 F.3d 1018, 1020 n.1 (7th Cir. 2009) ("In reciting the facts, we read the complaint liberally with every inference drawn in favor of plaintiff and resolve all factual disputes in favor of plaintiff.") ; *Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir. 2008) ("To survive a motion to dismiss, the plaintiff must state sufficient facts in the complaint to support a reasonable inference that defendants may be subjected to jurisdiction in the forum state."); *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) ("We accept factual allegations in the complaint as true to the extent that they are uncontested and, in cases of conflict, construe all reasonable inferences in the plaintiffs' favor."); *Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1338 (Fed. Cir. 2006) ("In reviewing the [personal jurisdiction] decision, we accept a plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in its favor.").

[16]*See Negron-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 23 (1st Cir. 2007) ("'[W]e caution that . . . the law does not require us struthiously to credit conclusory allegations or draw far-fetched inferences' " (quoting *Mass. Sch. of Law, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998))); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502 (2d Cir. 1994) ("[W]e will not draw 'argumentative inferences' in the plaintiff's favor"); *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009) ("Although we must resolve factual conflicts in [plaintiff's] favor, it is entitled to only those inferences that are reasonable."); *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004) ("While a district court must resolve all factual disputes in favor of the plaintiff . . . 'the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.' " (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1984))).

**[4]** We agree with these various circuits regarding the standard for drawing inferences from the complaint when addressing personal jurisdiction questions: We will draw reasonable inferences from the complaint in favor of the plaintiff where personal jurisdiction is at stake, and will assume credibility. This approach is in line with the pleading standard set forth by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). *See id.* at 1949 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

**[5]** Here, the key facts in the complaint include Fiore and Gipson's statements that they are Nevada residents; that at the time the funds were seized, they both maintained residences in Las Vegas to which they were returning; and that Walden knew, at least by the time he wrote the probable cause affidavit, that the funds they had on their persons and in their carry on luggage while changing planes in Atlanta were legitimate proceeds of their gambling trade.

## C. Application of the *Schwarzenegger* Test

Throughout the ensuing discussion, we concentrate on the false affidavit/forfeiture proceeding aspect of this case, because, as we explain below, we ultimately remand with respect to the initial search and seizure claim, for consideration of the application of the doctrine of pendent personal jurisdiction. *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); pp. 8974-75, *infra*.

### 1. Purposeful Direction

The first part of the *Schwarzenegger* test is subdivided into purposeful direction, which most often applies in tort cases, and purposeful availment, which most often applies in contract cases. 374 F.3d at 802; *see Pebble Beach*, 453 F.3d at

1155. Fiore and Gipson have alleged a tort action,[17] which calls for purposeful direction analysis.

We analyze purposeful direction under the three-part test derived from *Calder v. Jones*, 465 U.S. 783 (1984), commonly referred to as the *Calder*-effects test. *See Brayton Purcell*, 606 F.3d at 1128; *see also Calder*, 465 U.S. at 788-91; *Schwarzenegger*, 374 F.3d at 803. Under the *Calder*-effect test, " 'the defendant allegedly must have [(a)] committed an intentional act, [(b)] expressly aimed at the forum state, [(c)] causing harm that the defendant knows is likely to be suffered in the forum state.' " *Brayton Purcell*, 606 F.3d at 1128 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc)).

**[6]** "[D]ue process permits the exercise of personal jurisdiction over a defendant who 'purposefully directs' his activi-

---

[17]*Bivens* actions, like the one brought here by Fiore and Gipson, are constitutional tort claims against individual government officials. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971); *see also Van Strum v. Lawn*, 940 F.2d 406, 408-10 (9th Cir. 1991) (holding that state personal injury statutes of limitations apply to constitutional tort claims brought under *Bivens*); *Arnold v. United States*, 816 F.2d 1306, 1311 (9th Cir. 1987) (holding that the plaintiff's *Bivens* claim failed because she alleged only state-law tort claims, not constitutional tort claims).

We do not, of course, decide in this personal jurisdiction appeal any merits issues, including whether a *Bivens* action is available and whether any immunities apply. "Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Bell v. Hood*, 327 U.S. 678, 682 (1946); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction."); *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 951 (9th Cir. 1999) (holding that if a complaint's allegations fail to sufficiently state a claim, such failure is not jurisdictional, but rather cause for dismissal "on the merits under Rule 12(b)(6)").

ties at residents of a forum, even in the 'absence of physical contacts' with the forum." *Schwarzenegger*, 374 F.3d at 803 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (alteration omitted)). Intentional torts, in particular, can support personal jurisdiction over a nonresident defendant who has no other forum contacts. *Calder*, 465 U.S. at 790; *see also McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ___, 2011 WL 2518811 at *4-5 (Jun. 27, 2011) (plurality opinion).

### a. Intentional Act

**[7]** The "intentional act" prong of the *Calder*-effects test is satisfied in this case, as the district court recognized. "We construe 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. Submitting a false and misleading probable cause affidavit and referring the case for forfeiture proceedings in the absence of probable cause were intentional acts. *See, e.g., Bancroft & Masters, Inc v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) (sending a letter was an intentional act).

### b. Express Aiming

The "express aiming" prong of the *Calder*-effects test presents a more difficult question. The district court reasoned that "Walden's intentional act — the search of Plaintiffs' luggage and seizure of their currency — was expressly aimed at Georgia, not Nevada," because Walden's questioning of Fiore and Gipson, his search of their luggage and his seizure of their money all took place in Georgia. We may assume that is so. But, the district court, as noted, did not consider the false probable cause affidavit aspect of the case, as to which the express aiming prong, we conclude, is satisfied.

**[8]** In general, where there was "individual targeting" of forum residents — actions taken outside the forum state for

the purpose of affecting a particular forum resident or a person with strong forum connections — we have held the express aiming requirement satisfied. *See Brayton Purcell*, 606 F.3d at 1129-31; *Pebble Beach*, 453 F.3d at 1157; *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002); *Bancroft & Masters*, 223 F.3d at 1087.[18] At the same time, the express aiming requirement is not satisfied where it is merely foreseeable that there will be an impact on individuals in the forum. *Pebble Beach*, 453 F.3d at 1156; *Bancroft & Masters*, 223 F.3d at 1087; *Schwarzenegger*, 374 F.3d at 805.

In *Bancroft & Masters*, we explained that "[t]he presence of individualized targeting is what separates these cases from others in which we have found the effects test unsatisfied." 223 F.3d at 1088. In other words, the difference between those cases in which harm is merely foreseeable in the forum and those in which conduct is "expressly aimed" at the forum is often the difference between an *intended* impact that is either local or undifferentiated, and an *intended* impact that is

---

[18]Even before *Bancroft & Masters*, the case that made explicit the express aiming prong of the *Calder*-effects test, *see* 223 F.3d at 1087, the case law in this circuit focused on individual targeting of those with known, significant connections to the forum. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (holding that personal jurisdiction existed where "[t]he brunt of the harm . . . was felt in California," and the defendant "knew Panavision would likely suffer harm there because, although at all relevant times Panavision was a Delaware limited partnership, its principal place of business was in California"); *Gordy v. Daily News, L.P.*, 95 F.3d 829, 833 (9th Cir. 1996) (finding personal jurisdiction where "[t]he prime targeting [arose] . . . from the fact that [plaintiff was] an individual who live[d] in California"); *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989) (holding that there was personal jurisdiction over a defendant who "knew the injury and harm stemming from his communications would occur in Arizona, where [plaintiff] planned to live and work); *Lake v. Lake*, 817 F.2d 1416, 1423 (9th Cir. 1987) (holding that personal jurisdiction existed where defendant "took . . . actions for the very purpose of having their consequences felt in the forum state" and where those actions "amount[ed] to more than . . . untargeted negligence").

targeted at a known individual who has a substantial, ongoing connection to the forum.

For example, the maintenance of a passive website did not satisfy the express aiming requirement, even though the website was viewed by forum residents, because there was no "individualized targeting" involved in "merely registering and operating a passive informational website." *Brayton Purcell*, 606 F.3d at 1130. Similarly, there was no express aiming in *Schwarzenegger*, which involved an Ohio car dealership's unauthorized use of Arnold Schwarzenegger's photograph in local advertisements, none of which were circulated in California, the forum in which Schwarzenegger brought suit. 374 F.3d at 799-800. The "express aim was local," as the defendant intended the advertisement at issue to have only local effects. *Id.* at 807. The fact that the advertisement may have had forum effects, such as diminished compensation due to the "over-saturation of [Schwarzenegger's] image," *id.* at 800, was not sufficient to satisfy the express aiming prong. *Id.* at 807.

**[9]** With respect to the allegedly false affidavit and referral for forfeiture proceedings, the indications that Walden was expressly targeting Fiore and Gipson in Nevada are strong. From the outset, Walden must have known and intended that his actions would have impacts outside Atlanta. Walden confronted Fiore and Gipson at their boarding gate for a plane to Las Vegas, after learning from agents in San Juan that they had just flown from there. So he knew that they were merely changing planes in Atlanta, not staying there. When Walden spoke to them, Fiore and Gipson evidenced no connections whatever to Georgia; they said they were going to Las Vegas, and showed California drivers' licenses. Thus, Walden expressly aimed his actions at people and property he knew from the outset were *not* local.[19] *See id.*

_____

[19]The DEA agents in San Juan had been told about plaintiffs' Nevada connections. Fiore and Gipson's complaint states that they

Moreover, on the complaint's allegations, Walden definitely knew, at some point *after* the seizure but *before* providing the alleged false probable cause affidavit, that Fiore and Gipson had a significant connection to Nevada. First, Fiore and Gipson's complaint states that "the funds were readily identifiable [as] originating and returning to Las Vegas as the ordinary static place where they were situated as plaintiffs' bank for gambling." The complaint then goes on to state that "Walden . . . told plaintiffs in no uncertain terms that if they later produced legal receipts demonstrating the legitimacy of the funds, the funds would be returned." Attempting to so demonstrate,

> [u]pon returning to their homes in Las Vegas, plaintiffs marshaled records within Las Vegas to comply with defendant's request and representation . . . On August 30, 2006, plaintiffs forwarded the following to Walden *from Las Vegas*: i. Copies of federal tax returns showing that each plaintiff made their living through gaming; ii. Receipts for their trip; iii. Travel itinerary for the trip; and iv. Hotel records showing that they gambled at such a high level that the casinos would provide them rooms on a complimentary (free) basis.

(emphasis added). At this point, the complaint alleges, "Walden necessarily recognized that in addition to a 'bank' held by Gipson for his seed money in gaming and necessarily originating in Nevada, the seized funds included at least

---

volunteered that they had residences in Las Vegas (now their permanent residences) and California, truthfully provided [the DEA agent] with the additional information concerning their Las Vegas residences, and truthfully indicated that Las Vegas was the final destination of most if not all of the funds in their possession, the originating destination for a substantial part of the currency in their possession, and that they were returning to their residences in Las Vegas.

$30,000.00 in cash received from legal gaming win[nings] in Puerto Rico." The complaint also alleges that "[a]ll defendants recognized at all times that the destination of the funds at the time of the seizure was Las Vegas, Nevada, and that a substantial amount of the currency had also originated at Las Vegas, Nevada."

**[10]** Finally, the complaint alleges that after Fiore and Gipson arrived in Las Vegas, "either Walden or Defendant C, with Walden's acquiessance [sic] and encouragement, searched data bases for background on plaintiffs including data bases compiled and maintained in Nevada," and that "[t]hese searches indicated that the plaintiffs were 'squeaky clean.' " Moreover,

> [a]t the time that the probable cause affidavit was drafted, Walden and defendant C recognized that the funds were not subject to forfeiture and that they had authority and duty to return or cause the return of the seized . . . funds to plaintiffs in Las Vegas. . . [And] any reasonable officer acting in like or similar circumstances would have returned the seized funds to the plaintiffs in Las Vegas.

"Nevertheless, despite demand, despite knowledge of innocence, and despite the duty to return the funds, the funds were not returned to Las Vegas as required." Finally, according to the complaint, the funds ultimately were returned to Fiore and Gipson *in Las Vegas*, by the prosecutor to whom the case had been referred after Walden submitted the false affidavit. Taken together, these allegations indicate that at the time the assertedly false affidavit was composed and filed, Walden recognized that the plaintiffs had significant connections to Nevada, particularly with respect to the funds for which forfeiture was being sought.

For the purposes of personal jurisdiction, it does not matter whether Fiore and Gipson were legal residents of Nevada or

whether they simply had a significant connection to the forum, such that Walden's actions were " 'performed with the purpose of having' its 'consequences felt' by someone in [Las Vegas]." *Ibrahim v. Dep't Homeland Sec.*, 538 F.3d 1250, 1259 (9th Cir. 2008); *see also Brainerd*, 873 F.2d at 1259. *Ibrahim*, for example, concerned a woman from Malaysia who had studied at Stanford but was leaving, permanently, on the day of the incident that gave rise to the lawsuit. 538 F.3d at 1253. The defendant, a resident of Virginia who had no ties to California, had from the Transportation Security Intelligence Service's office in Washington, D.C., instructed San Francisco police to detain Ibrahim after her name appeared on the federal government's No-Fly List. *Id.* at 1253, 1258. We held the purposeful impact on Ibrahim in San Francisco sufficient to establish personal jurisdiction over the out-of-state defendant, because it was apparent to the defendant that his order's consequences would be felt in San Francisco. *Id.* at 1258-59. This was so even though the defendant did not initiate the phone call that resulted in him instructing the police in San Francisco to detain Ibrahim. *Id.* at 1258. Whether Ibrahim was a California resident at the time of her detention was not discussed in the case, indicating that her residence did not matter.

Similarly, in *Brainerd*, a defamation case, Brainerd, the plaintiff had accepted a tenured position with the University of Arizona, after which the defendant made defamatory statements about him to his new employer. 873 F.2d at 1258. Whether Brainerd was an Arizona resident at the time the defamatory statements were made was not a factor in the opinion's analysis. Instead, Brainerd's known connection to Arizona was sufficient to establish personal jurisdiction in Arizona over the defendant, a resident of Canada whose only contacts with Arizona consisted of communications with the University of Arizona regarding the plaintiff. *Id.* at 1258-59. The defendant "knew the injury and harm stemming from his communications would occur in Arizona, where Brainerd *planned* to live and work." *Id.* at 1259 (emphasis added).

In this case, the allegations in the complaint, taken as true for these purposes, establish that Walden necessarily recognized, at least by the time he wrote the probable cause affidavit, that the plaintiffs had a connection to Nevada that was at least as strong as in *Ibrahim*, in which the plaintiff left the forum state the day after the incident giving rise to the suit, never to return, 538 F.3d at 1253, or in *Brainerd*, where the plaintiff only *planned* to live and work in the forum where the injury occurred. 873 F.2d at 1259.

**[11]** Thus, whether Fiore and Gipson were residents of Nevada at the time of the filing of the false probable cause affidavit is not determinative of the question of personal jurisdiction over Walden. Moreover, as in *Ibrahim* and *Brainerd*, it is not relevant who *initiated* the contacts with Nevada. *See Ibrahim*, 538 F.3d at 1258-59; *Brainerd*, 873 F.2d at 1259. Instead, the critical factor is whether Walden, knowing of Fiore and Gipson's significant connections to Nevada, should be taken to have intended that the consequences of his actions would be felt by them in that state.

As to that issue, our precedents regarding personal jurisdiction in cases concerning fraud or similar causes of action are informative. That case law firmly establishes that if a defendant is alleged to have defrauded or similarly schemed against someone with substantial ties to a forum, the "expressly aimed" factor is met, even if all the defrauding activities occur outside the forum.

In *Bancroft & Masters*, for example, the defendant, a company based in Georgia, sent a letter to the company in Virginia that is the sole registrar of domain names in the United States, allegedly for the purpose of misappropriating a California company's domain name for its own use. 223 F.3d at 1087. This court held that the letter, sent from Georgia to Virginia, "was expressly aimed at California because it individually targeted [plaintiff], a California corporation doing business almost exclusively in California" and "the effects of

the letter were primarily felt, as [defendant] knew they would be, in California." *Id.* at 1088.

Similarly, *Metropolitan Life,* decided before this court explicitly adopted the "express aiming" analysis, held that personal jurisdiction existed in California over Geneva Gambrell, an Alabama resident who purposefully defrauded James Neaves, a California resident, by sending a letter to an insurance company representing that Gambrell was entitled to a payment that she knew actually belonged to Neaves. *Id.* at 1064-65. Gambrell sent the letter to the insurance company in California, rather than mailing it to the company's headquarters in New York, but the court explained that the location to which the letter was mailed did not matter. *Id.* at 1065. What mattered, instead, was that in "address[ing] the envelope to Metropolitan, she was purposefully defrauding Neaves in California." *Id.*

The situation here is similar to those in *Bancroft & Masters* and *Metropolitan Life*. The complaint alleges that Walden fraudulently executed a false and misleading probable cause affidavit, used it to encourage the U.S. Attorney in Georgia to prosecute a forfeiture action, and thereby sought to obtain the funds for the Atlanta DEA.[20] These allegations are analogous to an allegation that Walden attempted to defraud Fiore and Gipson of the seized funds. *See Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1155 (9th Cir. 2005) (listing the elements of fraud under Nevada law). According to the complaint, Walden falsely and with misleading omissions represented in the probable cause affidavit that the Atlanta DEA was entitled to the funds he knew rightfully belonged to Fiore and Gipson, whom he knew had a significant connection to Nevada. And the fraudulent execution of the probable cause affidavit was

---

[20]Had the forfeiture action been successful, the funds would have been transferred "to any Federal agency or to any State or local law enforcement agency which participated directly in the seizure or forfeiture of the property." 21 U.S.C. § 881(e)(1)(A).

intended to assist in the retention and eventual forfeiture of Fiore and Gipson's funds, actions which, Walden knew, would have their consequences felt in Las Vegas, *see Ibrahim*, 538 F.3d at 1259, the location to which he knew the funds should rightfully have been returned. Moreover, after Fiore and Gipson forwarded all of their documentation, Walden likely knew, if he did not know before, that Fiore and Gipson were professional gamblers with significant ties to Nevada and that seizing and attempting to keep their "bank" and their earnings would disrupt their business activities in Nevada. *See Bancroft & Masters*, 223 F.3d at 1087 (holding that the express aiming requirement was satisfied when defendant sent a letter to a company in Virginia with the alleged intent and result of disrupting the plaintiff's California business).

In sum, with regard to the filing of the false probable cause affidavit, Walden individually targeted Fiore and Gipson, as he was aware of their significant connection to Nevada and of the likely impact of his defrauding actions on their property and business in Nevada. Under our case law, these facts satisfy the express aiming prong of the *Calder*-effects test.

### c. Foreseeable Harm

**[12]** The final prong of the *Calder*-effects test is the requirement that the conduct at issue caused foreseeable harm in the forum. We "do[ ] not require that the 'brunt' of the harm be suffered in the forum." *Brayton Purcell*, 606 F.3d at 1131 (quoting *Yahoo!*, 433 F.3d at 1207). Instead, the foreseeable-harm "element is satisfied when defendant's intentional act has 'foreseeable effects' in the forum." *Id.* "If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Yahoo!*, 433 F.3d at 1207.

**[13]** The foreseeable harm factor, thus understood, is readily satisfied here. During their initial encounter, Walden knew

from their plane tickets, and from the San Juan DEA agent, that Fiore and Gipson were heading to Las Vegas, along with their $97,000. Moreover, Fiore and Gipson had explained at the airport that they were professional gamblers, and Fiore provided some documentation regarding her funds. After arriving in Nevada, Fiore and Gipson provided additional documentation of the legitimacy and sources of the funds. Consequently, Walden knew, by the time he wrote the fraudulent probable cause affidavit, that the money seized represented their professional earnings. The documentation also demonstrated that he had seized their $30,000 "bank," which they needed to pursue their trade in Nevada. Although the funds were eventually returned to Fiore and Gipson, it is a fair inference from the complaint that the return was delayed while the prosecutor considered whether to go forward with a forfeiture action on the basis of the false probable cause affidavit and sought, unsuccessfully, to forestall a lawsuit such as this one through execution of a release. The delay in returning the funds to Fiore and Gipson in Las Vegas caused them foreseeable harm in Nevada.

\* \* \*

**[14]** Taken as a whole, then, Fiore and Gipson's complaint satisfies the *Calder*-effects test. The complaint's allegations establish that, by falsifying the probable cause affidavit and attempting to secure permanently for the Atlanta DEA the seized funds, Walden committed (a) intentional acts that (b) individually targeted Fiore and Gipson in Nevada, and thus were expressly aimed at Nevada, and (c) caused foreseeable harm in Nevada. "An individual injured in [Nevada] need not go to [Georgia] to seek redress from persons who, though remaining in [Georgia] knowingly cause[d] injury in [Nevada]." *Calder*, 465 U.S. at 790. Accordingly, Fiore and Gipson have made a prima facie showing of purposeful direction. *See Brayton Purcell*, 606 F.3d at 1128-31.

## 2.  Forum-Related Conduct

We turn to the second part of the *Schwarzenegger* test: forum-related conduct. 374 F.3d at 802.

This circuit "follows the 'but for' test" to determine forum-related conduct. *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (quoting *Myers*, 238 F.3d at 1075). Fiore and Gipson must show that they would not have suffered the alleged injuries in Nevada "but for" Walden's false probable cause affidavit and attempt to facilitate a forfeiture prosecution. *See id.* As in *Menken*, the standard is "easily met" here. *Id.* at 1059.

**[15]** Fiore and Gipson have alleged that they would not have been deprived of their "bank" and the proceeds of their gambling trip for nearly seven months *but for* the seizure of *all* of their money in Atlanta, combined with Walden's actions that helped delay the return of the funds. Had Walden not filed the false probable cause affidavit, one can infer, the funds would have been returned considerably sooner. The forum-related conduct factor is therefore present.

## 3.  Reasonableness Determination

**[16]** As Fiore and Gipson have met their burden of satisfying the first two parts of the *Schwarzenegger* test for establishing personal jurisdiction in Nevada, the burden shifts to Walden to satisfy the third part — " 'present[ing] a compelling case' that the exercise of jurisdiction would not be reasonable" in Nevada. *Menken*, 503 F.3d at 1057 (quoting *Schwarzenegger*, 374 F.3d at 802). To determine reasonableness, we balance seven factors:

> [(a)] the extent of the defendants' purposeful interjection into the forum state's affairs; [(b)] the burden on the defendant of defending in the forum; [(c)] the extent of conflict with the sovereignty of the defen-

dants' state; [(d)] the forum state's interest in adjudicating the dispute; [(e)] the most efficient judicial resolution of the controversy; [(f)] the importance of the forum to the plaintiff's interest in convenient and effective relief; and [(g)] the existence of an alternative forum.

*Id.* at 1058 (quoting *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004)).

### a.  Extent of Purposeful Interjection into Affairs of Forum State

Regarding the first factor, Walden argues that because the initial search and seizure occurred in Georgia, his actions did not inject him into the affairs of Nevada. We have recognized that circumstances may exist where "the level of purposeful injection into the forum supports a finding of purposeful availment yet still weighs against the reasonableness of jurisdiction." *Dole Food*, 303 F.3d at 1115. But that hypothetical situation does not exist here.

When Walden sought out Fiore and Gipson at their boarding gate at the Atlanta airport, he knew that their presence in Georgia was fleeting, and that they were going to Nevada. Without probable cause, he seized all of Fiore and Gipson's money, approximately $97,000, which also was destined for Nevada. Even if Walden did not know at the time he seized the funds that Fiore and Gipson had ongoing, substantial connections to Nevada, he necessarily learned of these connections at some point before providing the alleged false probable cause affidavit and referring the case for forfeiture proceedings.

[17] As it turned out, the impact of the intentional torts alleged, which involved taking a large sum of money from Fiore and Gipson, would necessarily have their primary impact where the funds were meant to be kept and used,

Nevada. As an airport law enforcement officer, Walden was necessarily aware that his actions would often have their principal impact outside of Georgia, as many of the people he investigates are in Atlanta only on their way to somewhere else.[21] In that sense, Walden's job necessitates regularly interjecting himself into affairs of other jurisdictions. By preventing the $97,000 from reaching the intended destination, Nevada, Walden prevented Fiore and Gipson from using their legitimate earnings there, and deprived Nevada banking and the Nevada tax base of the money for a considerable time. In short, although he never stepped foot in Nevada, Walden's " 'purposeful interjection into [Nevada] was significant.' " *Ibrahim*, 538 F.3d at 1259 (quoting *Ziegler v. Indian River County*, 64 F.3d 470, 475 (9th Cir. 1995)).

### b.  Burden of Defending in the Forum

Concerning the second factor, Walden maintains that he would be burdened because he has never resided, visited, owned property, or conducted business in Nevada. Were Walden a local small business person or an airport employee, his argument might well have force. But in fact, Walden was working as a federal law enforcement officer, which is the only reason he could seize the funds or seek to facilitate their forfeiture.

---

[21]The Atlanta airport is a major transportation hub. A fact sheet published by the airport states that, since 1998, the Atlanta airport has been the busiest passenger airport *in the world*, with an average of more than 240,000 passengers a day. *See Fact Sheet,* Hartsfield-Jackson Atlanta Int'l Airport (2011), available at http://www.atlanta-airport.com/Passenger/pdf/Fact_Sheet_2011.pdf (last viewed Jul. 13, 2011). In August 2006, the month Fiore and Gipson transferred planes in Atlanta, more than 3.6 million passengers took flights arriving at the Atlanta airport, and approximately the same number boarded flights leaving the Atlanta airport. *See Monthly Airport Traffic Report*, Dep't of Aviation, Hartsfield-Jackson Atlanta Int'l Airport (Aug. 2006), available at http://www.atlanta-airport.com/docs/Traffic/200608.pdf (last viewed Jul. 13, 2011).

When federal employees are sued under *Bivens*, the government, as a rule, provides for their defense, and, ultimately, indemnifies them. *See* 28 C.F.R. § 50.15. As Fiore and Gipson pointed out in their brief to this court, Walden appeared in Nevada "represented by the world's largest law firm with offices in all fifty states and providing defense free of charge (The Office of the United States Attorney)." On appeal, Walden is represented by the appellate staff of the Civil Division of the Department of Justice in Washington, D.C., which often appears in this court. Fiore and Gipson, in contrast, had to retain counsel to seek redress for their alleged constitutional injuries. Walden's burden in defending this case is thus small as compared to the likely burden on Fiore and Gipson were the case brought in Georgia. This factor therefore does not weigh in favor of Walden, although it would in all probability weigh in favor of many airport-connected defendants not associated with the federal government.

### c. Extent of Conflict with Sovereignty of Defendant's State

The third factor, the extent of conflict with the sovereignty of Georgia, favors Fiore and Gipson. This is a federal action that will be resolved in federal court. The federal government, not Georgia, was the entity on whose behalf the funds were seized and retained. And as Fiore and Gipson have no connection to Georgia, Goergia has no interest in protecting their interests. Consequently, redress of Walden's tortious conduct that injured Nevada residents in Nevada will not "infringe on the sovereignty of [Walden's] home state of [Georgia]." *Ibrahim*, 538 F.3d at 1259.

### d. Interest of Forum State in Adjudicating the Dispute

[18] Nevada has " 'a strong interest in providing an effective means of redress for its residents who are tortiously injured.' " *Id.* (quoting *Ziegler*, 64 F.3d at 475). Fiore and

Gipson are Nevada residents; a substantial portion of their $97,000 that Walden seized originated in Nevada; the money was en route to Nevada when seized; the seized money was destined to enter Nevada's economy and tax base; the money eventually was returned to Fiore and Gipson in Las Vegas, Nevada; and Fiore and Gipson have incurred considerable attorneys' fees in Nevada in securing the return of their unlawfully seized, legitimate earnings and in filing this action to redress the financial injuries they suffered in Nevada. For all these reasons, Nevada has a considerable interest in adjudicating this dispute. *See id.*

### e. Most Efficient Resolution of the Controversy

The fifth factor concerns efficiency of the forum, a consideration that turns primarily on the location of witnesses and evidence. *See Menken*, 503 F.3d at 1060-61. Fiore and Gipson represent that their witnesses likely will include: three people from San Juan, Puerto Rico; three from Atlanta, Georgia; one from Quantico, Virginia; and at least Fiore and Gipson from Las Vegas, Nevada. If Walden places at issue Fiore's and Gipson's reputations as proficient, practicing gamblers, additional Nevada witnesses likely will be necessary.

Fiore and Gipson also emphasize that their documentation was generated in and is located in Nevada. These documents, including voluminous records sent to Walden from Nevada, which evidence that Fiore and Gipson are professional gamblers and that the cash in their possession, unremarkable given their trade, did not provide probable cause for Walden's continued seizure and attempted forfeiture of their funds. Moreover, Fiore and Gipson argue that most of the documentation relevant to Walden's actions is located in the Department of Justice in Washington, D.C., in the DEA headquarters in Quantico, Virginia, or in Nevada, not in Georgia.

In contrast, Walden argues only that the witnesses in Georgia are the most important, that the "operative versions" of

Fiore and Gipson's documents are "those received by DEA in Georgia."

Overall, this factor is fairly evenly balanced, weighing, if at all, only slightly in favor of Fiore and Gipson.

### f. Importance of Forum to Plaintiffs' Convenient and Effective Relief

The sixth factor, the importance of Nevada to Fiore and Gipson's convenient and effective relief, generally is not given much weight in this circuit. *See Dole Food*, 303 F.3d at 1116 (noting that "in this circuit, the plaintiff's convenience is not of paramount importance"). It does, however, weigh in Fiore and Gipson's favor. Fiore and Gipson are Nevada residents; the seizure of their gambling proceeds by Walden occurred as they were changing planes in Georgia, a state to which they appear to have had no other connection. All of their financial injury was realized in Nevada, which is also the location of their documentation. Fiore and Gipson also have a continuing relationship with a Nevada law firm. For all these reasons, Nevada is a convenient and effective forum for them.

### g. Existence of an Alternative Forum

For the reasons given in evaluating the preceding six factors, although Georgia is an available forum in the sense that the suit against Walden could have been brought there, Georgia is not a preferable alternative to Nevada. In addition, at this preliminary stage of proceedings, the parties have not had the benefit of discovery to identify the other DEA employee who made relevant decisions regarding the false affidavit and attempt to instigate forfeiture proceedings while retaining the seized funds. According to the complaint, that individual operated from Virginia. As to him or her, Georgia might not be an available forum, but Nevada would be, for the same reason it is a proper forum for suit against Walden.

* * *

**[19]** Taken as a whole, the seven-factor reasonableness analysis disfavors Georgia as a forum, and, overall, mildly favors Nevada. Walden has not come close to making a "compelling case" that exercise of jurisdiction over him in Nevada would be unreasonable. *See Schwarzenegger*, 374 F.3d at 802.

## 4. Conclusion

Due process is met when there is " 'a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The actions related to the false probable cause affidavit satisfy the express aiming prong, as well as the other requirements for personal jurisdiction. Under *Calder* and *Schwarzenegger*, it is reasonable and comports with traditional notions of fair play and substantial justice for Fiore and Gipson to call Walden to answer in Nevada for those deliberate actions.

That is not to say, and we are not holding, that intentional tortious conduct aimed at a person where he or she is in transit at an airport is sufficient, standing alone, to confer personal jurisdiction over an airport-connected official or employee. In this case, Walden did much more: He individually targeted Fiore and Gipson in Nevada by creating a false and misleading probable cause affidavit and thus illegally seeking to foster the forfeiture of the funds to benefit the Atlanta DEA. His conduct in doing so was expressly aimed at Nevada because at that point, if not before, he knew that Fiore and Gipson had ongoing and substantial connections to Nevada. If, as alleged, he also knew that there was no legitimate reason to seek forfeiture of the funds, his actions amounted to an attempt to defraud Nevada residents. Moreover, the traditional weight

given to a defendant's inconvenience in having to litigate in a forum in which he has few contacts does not apply in this case, given that Walden can be represented just as easily by the United States Attorney's Office in Nevada as by the Office in Georgia.

**[20]** Under these circumstances, the district court erred in concluding that it lacked personal jurisdiction over Walden, at least as to the portion of Fiore and Gipson's complaint pertaining to the false probable cause affidavit and resulting delay in returning the funds.

## C.  Pendent Personal Jurisdiction

Under our case law, the district court may exercise pendent personal jurisdiction over the remainder of Fiore and Gipson's claims even if there would not be personal jurisdiction over them standing alone. *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004). *Action Embroidery* was the first case in this court adopting the doctrine of pendent personal jurisdiction, *id.* at 1181, under which "a court may assert . . . jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.* at 1180. The facts underlying a particular claim need not exactly track the facts underlying the claims for which there is personal jurisdiction, so long as the core facts are the same. *See CE Distrib.*, 380 F.3d at 1113-14.[22]

Here, the core facts of all of Fiore and Gipson's claims

---

[22]In *CE Distribution*, this court approvingly cited a Seventh Circuit opinion, *Channell v. Citicorp Nat'l Svcs., Inc.*, 89 F.3d 379, 385 (7th Cir. 1996), which noted that only a "loose factual connection between the claims" is necessary for the purposes of pendent jurisdiction. *CE Distrib.*, 380 F.3d at 1114.

arise out of the same incident: Walden's seizure of their funds at the Atlanta airport. When he seized their funds, Walden knew that Fiore and Gipson were traveling to Las Vegas and that they had no connection to Georgia beyond their transit through the airport. Walden first individually targeted Fiore and Gipson when he confronted them at their gate as they were about to board, and the funds then seized were the same funds as to which forfeiture was sought through the submission of the false affidavit. Further, and critically, the false affidavit was false — or not — in its description of the events at the Atlanta airport surrounding the seizure. So the same facts will have to be developed with regard to the search and seizure and false affidavit claims. Consequently, even if those facts are not sufficient independently to give rise to personal jurisdiction over Walden for the initial seizure, they weigh strongly in favor of the exercise of pendent personal jurisdiction.

In *Action Embroidery*, this court accepted for purposes of the appeal the defendant's contention that there was no personal jurisdiction over state-law claims standing alone, but held that the district court could exercise pendent personal jurisdiction over them. 368 F.3d at 1180. We follow the same course here and remand to the district court "to decide whether to retain or dismiss the pendent [search and seizure] claims." *Id.* at 1181.

## D. Venue

Although Walden raised the defense of improper venue in the district court, the issue was not addressed once the court determined that there was no personal jurisdiction over Walden in Nevada. Because we have concluded otherwise, we also consider his defense of improper venue, which he pursues on appeal.

The controlling statute provides in relevant part: "A civil action wherein jurisdiction is not founded solely on diversity

of citizenship may, except as otherwise provided by law, be brought only in . . . *a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.*" 28 U.S.C. § 1391(b)(2) (emphasis added). Walden contends that Nevada is an improper venue for this action because it has no relationship to the event about the seizure of Fiore and Gipson's $97,000 at the Atlanta airport.[23]

"[I]n a tort action, the locus of the injury [is] a relevant factor" in making this determination. *Myers*, 238 F.3d at 1076. In *Myers*, the fact that "at least one of the 'harms' suffered by

---

[23]Walden relies on *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979), and *Sutain v. Shapiro & Lieberman*, 678 F.2d 115 (9th Cir. 1982) in arguing that Fiore and Gipson cannot establish venue under 28 U.S.C. § 1391(b)(2). Both of these cases, however, addressed § 1391(b) as it read before amendments contained in the present version. Those amendments changed language that had limited venue to districts "in which the claim arose," to provide that venue lies where "a substantial part of the events or omissions giving rise to the claim occurred." We have recognized this distinction and noted that *Leroy* no longer can be used as Walden maintains. *Newton v. Thomason*, 22 F.3d 1455, 1464 & n.8 (9th Cir. 1994). Moreover, in *Sutain*, the only event that occurred in the forum in question was the appearance of a partner of the defendant accounting firm in Tax Court, in response to a subpoena. 678 F.2d at 117. That such an event was "not 'substantial' for the purposes of" establishing venue, *id.*, does not undermine our conclusions in this case.

Walden also urges us to rely on *Stafford v. Briggs*, 444 U.S. 527 (1980), which held that 28 U.S.C. § 1391(e), addressing venue in civil actions against officers of the United States acting in their official capacity, could not be read to allow suits against individual officers for money damages to go forward in any federal district in the country because to do so "would place federal officers . . . in a very different posture in personal damages suits from that of all other persons." *Id.* at 544. Walden's argument that finding venue proper in Nevada in this case would similarly result in a precedent that allowed any law enforcement officer working in a transportation hub to be sued in any forum in the country is contradicted by our earlier analysis regarding personal jurisdiction. Moreover, Fiore and Gipson do not maintain, and we are not holding, that law enforcement officers who work at transportation hubs are subject to nationwide venue because of their status. For venue to lie, the terms of § 1391(b)(2) must be met, as they are in this case.

Plaintiffs . . . was felt in Nevada" was sufficient to make venue proper in Nevada. *Id.* Fiore and Gipson similarly suffered harm in Nevada. All the economic injuries suffered by Fiore and Gipson were realized in Nevada, including their loss of use and interest on the funds for nearly seven months. The facts concerning the origin and legitimacy of the $97,000 are also connected to Nevada: The $30,000 "bank" originated in Nevada; Walden fabricated a fraudulent probable cause affidavit to institute forfeiture proceedings against Fiore and Gipson after they had returned to their residences in Nevada, which affected them there; the documentation of the legitimacy of the money was sent from Nevada; and the funds eventually were returned to Fiore and Gipson in Nevada, verifying the lack of probable cause for forfeiture. The arrival of the funds in Nevada was the event that caused Fiore and Gipson's cause of action to mature, because their case was not ripe until the government abandoned the forfeiture case against them. *See Albright v. Oliver*, 510 U.S. 266, 280 (1994) (Ginsburg, J., concurring). Taking all these events together, "a substantial part of the events or omissions giving rise to the claim occurred" in Nevada. 28 U.S.C. § 1391(b)(2). Venue is proper in the District of Nevada.

## III.   CONCLUSION

**[21]** Walden seized all of the large amount of money Fiore and Gipson were carrying with them as they travelled from San Juan to Las Vegas via Atlanta. Although Fiore and Gipson sent Walden, from Nevada, documentation establishing the legitimate sources of their funds, he persisted in seeking forfeiture of their money. Walden's intentional acts with regard to the false probable cause affidavit and the consequent delay in returning their money were expressly aimed at Nevada and so satisfy the requirements for personal jurisdiction. As to the search and seizure claim, we are remanding it to the district court for the exercise of discretion with regard to pendent personal jurisdiction. We also hold that venue is proper in the District of Nevada.

## IV.   POST-SCRIPT

### A.

As the foregoing analysis makes clear, Judge O'Scannlain's dissent from the denial of rehearing en banc criticizes an opinion we did not write. Fiore and Gipson's complaint alleges not only that Walden seized their funds in violation of the Fourth Amendment—a claim we assume does *not* independently support personal jurisdiction in Nevada, *see supra* page 8957—but also that among other things, by filing a false affidavit, he effected a continued seizure of these funds, also in violation of the Fourth Amendment. Judge O'Scannlain ignores these latter allegations, but they are clearly—indeed, predominantly—pleaded in the complaint, which alleges:

> 102. It is clearly established law that any reasonable police officer would recognize the defendants undertook the following actions in violation of the Fourth Amendment of the United States Constitution:
>
> > i. In initially seizing the funds at issue despite a lack of probable cause that would have been recognized by a reasonable officer in the employ of the United States;
> >
> > ii. In retaining the funds despite an ability to return after actually reaching a conclusion that plaintiffs' funds were not the result of any drug related activity;
> >
> > iii. In drafting and forwarding for prosecution a probable cause affidavit for the continued seizure of plaintiffs' funds while knowing that the affidavit contained false statements of fact to support the continued retention, and without such false statements

would have indicated a clear lack of proba-
ble cause; and

    iv. In willfully seeking to prosecute the
funds while withholding exculpatory infor-
mation known to them.

    v. In willfully and intentionally with-
holding the scope of the exculpatory infor-
mation to the Assistant United States
Attorney to whom the defendants for-
warded the matter for prosecution.

After that, the summarizing paragraph states:

    110. Defendants' actions constitute a violation of
U.S. Const. Amd. IV in the unreasonable seizure *and
unreasonable continued seizure* of the plaintiff's
funds. (Emphasis added)

As we have explained, according to the complaint, Walden
was well aware of Fiore, Gipson, and the seized funds' sub-
stantial connection to Nevada by the time he filed the false
affidavit, sought forfeiture of the funds, and withheld exculpa-
tory evidence. Under our caselaw and that of the Supreme
Court, these known connections are more than sufficient to
support personal jurisdiction. Moreover, far from holding that
the plaintiffs' residence is determinative, as Judge
O'Scannlain suggests, we have expressly held that it is not.
*See supra* page 8961-62. Although the opinion Judge
O'Scannlain imagines we issued might well merit further
review, the one we actually wrote does not.

**B.**

We agree with Judge McKeown's statement in her dissent
from the denial of rehearing en banc that for Nevada constitu-
tionally to exercise jurisdiction over Walden, he would need

to be a " 'primary participant[ ] in an alleged wrongdoing intentionally directed at' " Nevada. __ F.3d __, __ (9th Cir. 2012) (McKeown, J., dissenting from denial of rehearing en banc) (quoting *Calder*, 465 U.S. at 790). We disagree, however, for reasons we have explained, with her contention that this standard has not been met here.

In particular, contrary to Judge McKeown's assertion that "Nevada was neither a 'focal point' nor relevant to the affidavit," the complaint alleges that the "funds were readily identifiable [as] originating and returning to Las Vegas as the ordinary static place where they were situated as plaintiffs' bank for gambling" and that, when eventually returned, the funds were returned to Nevada. Fiore and Gipson allege that, by filing a false affidavit to support continued retention of these funds, Walden wrongfully perpetuated a seizure of funds he *knew* originated in and were returning to Nevada, belonging to people he *knew* had substantial connections to that state, all in an effort "to support the continued retention" of the funds. That is, the complaint alleges that Walden was a primary participant in a wrongdoing intentionally and directly—not just foreseeably or derivatively— targeting Nevada funds and persons.

Under our case law, these allegations unquestionably support personal jurisdiction in Nevada. Our cases hold that where a defendant's actions have only an indirect or unintended impact on forum-resident plaintiffs, even where a defendant knows of a plaintiff's forum-residence and could foresee such an impact, the express-aiming requirement is not satisfied. *See, e.g.*, *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004). In contrast, where —as in this case —a defendant intentionally, individually, and directly targets a person—or, as here, funds—known to have strong connections with a forum, we have held the express-aiming requirement satisfied. *See Bancroft & Masters v. Augusta Nat'l*, 223 F.3d 1082, 1087 (9th Cir. 2000); *see also Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063,

1076 (10th Cir. 2008) (citing approvingly *Bancroft & Masters* and holding that express aiming was satisfied where the purpose of defendant's actions was to cause harm to forum-resident plaintiffs).

The complaint alleges not that Walden inadvertently filed a false affidavit, but rather that he intentionally filed an affidavit he *knew* was false, —allegations analogous to fraud.[24] As this opinion discusses in detail, our caselaw firmly establishes that fraud directed at harming a *particular* person in a forum meets the express aiming standard.

A straightforward application of circuit precedent to the facts of this case leads easily to the conclusion that there is indeed personal jurisdiction over Walden in Nevada: Walden intentionally targeted persons and funds with substantial connections to Nevada. He thus expressly aimed his conduct at that state, providing a sufficient basis for personal jurisdiction. There is nothing at all novel about this conclusion.

**REVERSED and REMANDED.**

---

IKUTA, Circuit Judge, dissenting:

Gambling, it is said, is a "sure way of getting nothing from something." Here, by contrast, two professional gamblers get something from nothing. Although their complaint contains nothing that would provide a basis for asserting personal jurisdiction over the federal agent who allegedly violated their Fourth Amendment rights, the majority finds "something" in the complaint: specifically, the "false affidavit/forfeiture proceeding *aspect*" of their case. Maj. op. at 8955 (emphasis

---

[24]Judge McKeown is concerned that the affidavit is not in the "record." Of course, that is because this case comes to us on a motion to dismiss. At this juncture, the record is essentially limited to the complaint.

added). This "aspect," the majority determines, provides a basis for personal jurisdiction over the federal agent, even though it is neither a constitutional tort nor a state law claim, and even though plaintiffs never argued that it was. And the gamblers' lucky streak does not end there: the majority then reverses the district court for failing to discern this elusive "aspect" and to apply the entirely discretionary (and rarely invoked) doctrine of "pendent personal jurisdiction." In fact, the district court correctly determined that the complaint did not make a prima facie showing that the federal agent purposefully directed his actions to the forum state. Because the district court did not err in dismissing the complaint for want of personal jurisdiction, I dissent.

I

The complaint in this case relates the following tale. Gina Fiore and Keith Gipson are professional gamblers. On their return from a gambling trip to San Juan, Puerto Rico, their "traveling bank"[1] and winnings had grown to over $97,000, which they divided between their carry-on bags and their pockets. At the San Juan airport, TSA agents searched Gipson's bag and found about $50,000. The agents also discovered about $30,000 in Fiore's carry-on. Upon spotting such large sums of cash, the TSA agent called a supervisor, who contacted DEA agent Michael Cuento and two others.

Fiore told Cuento that she and Gipson had departed from the El San Juan Casino, where they had been gambling. Fiore and Gipson showed Cuento valid California driver's licenses, volunteered that they had Nevada and California residences, and indicated that they were returning to their residences in Las Vegas. Cuento escorted them onto the plane, but he told them they should not be surprised if they were asked further questions.

---

[1]A "traveling bank" is a significant amount of currency (here, tens of thousands of dollars) carried by professional gamblers to cover traveling expenses and give them a cushion if they suffer losses.

Fiore and Gipson landed in Atlanta and proceeded to their gate for their connecting flight to Las Vegas. There, they met agent Walden and another DEA agent who called for a drug-sniffing dog. Fiore and Gipson were (falsely, they say) informed that the dog had alerted. Agent Walden seized their cash, but assured them that if they produced receipts demonstrating that the funds were legitimate, their money would be returned. With that assurance, plaintiffs boarded their plane to Las Vegas. From the fact that their checked bags did not make it to Las Vegas with the plane, the disheveled state of the items inside, and the absence of a TSA sticker, plaintiffs surmised that the DEA, with the participation of agent Walden, conducted a search of their checked baggage.

Upon their return, Fiore and Gipson forwarded to Walden tax returns, receipts from their trip, their travel itinerary, and hotel records showing that they had gambled enough to have rooms "comped." They explained that Gipson had played under a legal alias he commonly used in gaming. They also sent a "win record" on El San Juan letterhead. Despite, as plaintiffs allege, "necessarily recogniz[ing] that the seized funds were not related to any illicit drug trade and were not contraband or the proceeds of contraband," Walden did not return their funds. Not only that, but they allege "on information and belief" that Walden, along with two unnamed defendants, worked "to provide a false probable cause affidavit, known by each to be false, for forwarding to the U.S. attorney in Georgia to prosecute a forfeiture action," an affidavit that Fiore and Gipson contend omitted exculpatory information.

Even though Walden necessarily recognized the funds' legitimacy, plaintiffs allege, he did not return the funds and referred the matter for prosecution because he "personally disapproved" of the strategies plaintiffs used in gambling.[2] The

---

[2]Walden's uncontested declaration, by contrast, states that he lacked any authority over the seized cash once it had been transferred to a secure location for processing and storage.

AUSA to whom the matter was referred ultimately ordered the funds returned some six months later for lack of probable cause.

If plausible, this story might support Fiore and Gipson's claim that Walden seized their traveling bank in violation of their Fourth Amendment rights. But there is one problem: Fiore and Gipson filed the complaint against Walden in a district court in Nevada, but failed to allege that Walden had *any* contacts with that state for purposes of personal jurisdiction. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (personal jurisdiction cannot constitutionally be asserted unless defendant has "certain minimum contacts with [the forum State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'" (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))). Notably absent from plaintiffs' complaint is any allegation:

- that plaintiffs told Walden of their Las Vegas residences;

- that Cuento ever spoke with Walden;

- that Cuento told Walden of plaintiffs' connection to Las Vegas;

- that plaintiffs showed Walden any Nevada-issued identification (in fact, Agent Walden's uncontested declaration confirms that Fiore and Gipson showed him California, not Nevada, licenses);

Indeed, the complaint does not expressly allege that even *after* the seizure, Walden became aware that plaintiffs' residence was in Nevada; it alleges only that plaintiffs forwarded their tax returns, trip receipts, and the like to Walden "from Las Vegas." And Walden's uncontested declaration makes clear that he never contacted plaintiffs' attorney "or anyone

else in Nevada," and has never lived in, been to, owned property or conducted any business in Nevada.

Given these facts, and applying the applicable precedent, *see Calder v. Jones*, 465 U.S. 783 (1984); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004), the district court concluded that Walden's search of plaintiffs' luggage and seizure of the money "was expressly aimed at Georgia, not Nevada": the search occurred in Georgia, as did the questioning and the seizure. It therefore dismissed plaintiffs' action for want of personal jurisdiction. As explained below, the district court's thorough and well-reasoned decision was clearly correct.

## II

For a court to have specific personal jurisdiction over a defendant in a tort suit, (1) the defendant must have purposefully directed specific activities toward the state forum, (2) the plaintiff's claim must arise out of or relate to those specific forum-related activities, and (3) the exercise of jurisdiction must comport with "fair play and substantial justice." *Schwarzenegger*, 374 F.3d at 802; Fed R. Civ. P. 4(k)(1)(A). In other words, in order for the district court to have asserted personal jurisdiction over Walden, it would have had to conclude that Walden purposefully directed the actions that form the basis of plaintiffs' claim to Nevada.

In determining whether the defendant "purposefully directed" the activities which are the subject of plaintiff's claim to the forum state, we consider whether the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Calder v. Jones*, 465 U.S. at 788-89). As a matter of simple logic, a defendant cannot "expressly aim" an intentional act at a victim's home state if the defendant committing the action does not even

know that the victim has any connection with that state. *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("From the available cases, we deduce that the ['express aiming'] requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state."); *cf. Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258 (9th Cir. 2008) (approving the exercise of personal jurisdiction in California where defendant, a Virginia resident with no other ties to California, ordered local police to prevent plaintiff from flying out of the San Francisco airport and to detain her for further questioning).

This framework creates a problem for Fiore and Gipson: when Walden seized the cash, he knew only that the plaintiffs had California driver's licenses and were headed to Las Vegas. The complaint does not even hint that Walden learned of plaintiffs' ties to Las Vegas until *after* the seizure was complete. Because there is no allegation that Walden purposefully directed the actions that form the basis of plaintiffs' claim to Nevada, a Nevada district court necessarily lacks personal jurisdiction over Walden. That should be the end of the matter.[3]

## III

But it is not, because the majority shows more creativity construing the complaint than Fiore and Gipson did drafting it. That is, the plaintiffs allege one simple claim: a violation of their Fourth Amendment rights to be free of unreasonable searches and seizures. The gravamen of Fiore and Gipson's complaint is that "[t]he search and withholding of [their] checked baggage . . . was without probable cause, unreason-

---

[3]Indeed, the majority concedes that the complaint does not allege that Walden knew of plaintiffs' Nevada residency when he seized the $97,000. *See* maj. op. at 8961.

able, and also constituted an illegal search and seizure by the defendants." Or, as they later put it, "Defendants' actions constitute a violation of U.S. Const. Amd. IV in the unreasonable seizure and unreasonable continued seizure of the plaintiff's funds."

The majority, however, purports to flush out a second claim roosting amidst the lines of the complaint. According to the majority, there is a "false affidavit/forfeiture proceeding aspect of [the] case," maj. op. at 8955, which gives rise to "an allegation that Walden attempted to *defraud* Fiore and Gipson of the seized funds," maj. op. at 8964 (emphasis added). Because, the majority explains, at the time Walden prepared the false probable cause affidavit, he knew plaintiffs had significant connections with Nevada, the district court erred in not asserting personal jurisdiction over Walden based on this false affidavit "aspect" of the case. Maj. op. at 8964-65.

The majority's analysis completely misses the mark for a crucial reason: the complaint did not include a fraud claim. We analyze personal jurisdiction on a claim-by-claim basis. *See, e.g.*, *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 09-56528, ___ F.3d ___, 2011 WL 3437040, at *7 (9th Cir. Aug. 8, 2011) (focusing the jurisdictional inquiry on plaintiff's state law misappropriation claim); *see also Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (stating that a district court's specific personal jurisdiction "is claim specific," meaning that personal jurisdiction over one defendant as to a particular claim does not necessarily give the court personal jurisdiction over that same defendant as to the plaintiff's other claims). The only claim in this complaint is a Fourth Amendment claim for seizure of property. There is no claim that Walden's preparation of the allegedly fraudulent affidavit violated plaintiffs' Fourth Amendment rights,[4] and it is doubtful that such a constitutional tort even exists.

---

[4]One combs through the complaint in vain to find any argument that the creation of a false probable cause affidavit is a separate constitutional tort. Rather, the plaintiffs point to the false affidavit to support their Fourth Amendment claim, stating that "[t]he law is clearly established that falsifying evidence on an affidavit in support of a seizure or a search renders the seizure or search unconstitutional."

Nor did the plaintiffs bring a state fraud claim. In fact, the plaintiffs do not appear to bring any state claim at all: they claimed federal jurisdiction based on the general federal question statute (28 U.S.C. § 1331) and 28 U.S.C. § 1356,[5] and do not invoke diversity jurisdiction. For that matter, the complaint does not allege over $75,000 in controversy as required for diversity jurisdiction, *see* 28 U.S.C. § 1332(a), or facts from which it is "facially apparent" that the "jurisdictional amount is in controversy," *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997) (internal quotation omitted). Nor does the complaint invoke supplemental jurisdiction.

Indeed, it is doubtful that the elements of a state law fraud cause of action are even lurking in the complaint. Under Nevada law, the elements of a fraud cause of action are (1) a false representation by defendant; (2) defendant's knowledge or belief that the representation was false; (3) defendant's intent that plaintiff act or refrain from acting in reliance upon the misrepresentation; (4) plaintiff's justifiable reliance upon it; and (5) damage to plaintiff as a result. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1155 (9th Cir. 2005). The complaint does not, however, allege that Walden intended plaintiffs to act or refrain from acting in reliance on the false affidavit, or that plaintiffs justifiably relied on the affidavit.

In any event, an unarticulated state law claim could not give the majority a basis for reversing the district court. When the district court, which had original jurisdiction only over the Fourth Amendment claim, dismissed that claim for lack of personal jurisdiction, it was well within its discretion to decline to exercise supplemental jurisdiction over any implicitly lurking state law claim. *See* 28 U.S.C. § 1367(c)(3); *Bry-*

---

[5]28 U.S.C. § 1356 provides: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of any seizure under any law of the United States on land or upon waters not within admiralty and maritime jurisdiction . . . ."

*ant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002) (district court's decision to decline supplemental jurisdiction reviewed for abuse of discretion).

Because plaintiffs based their claim on Walden's seizure of the cash (which not even the majority contends was purposefully directed toward Nevada) and did not, as the majority suggests, allege a fraud claim, it is impossible to say that plaintiffs' *claim* arose out of or related to Walden's conduct in preparing the allegedly false probable cause affidavit. *See Schwarzenegger*, 374 F.3d at 802.

## IV

The majority's reasoning threatens a substantial expansion of the scope of personal jurisdiction. If a district court commits reversible error by failing to give due weight to the "false affidavit/forfeiture proceeding *aspect*" of a complaint, maj. op. at 8955 (emphasis added), even where the parties never asked the court to do so, district courts must scour complaints to find some allegation of wrongful action that might have occurred after the defendant became aware of the plaintiff's residence. Such a ruling essentially requires courts to assert personal jurisdiction over any defendant who learns about the home state of the plaintiff at any time *after* the defendant engaged in the conduct that formed the basis of plaintiff's claim. To ensure this result, plaintiffs need only assert that the defendant knew their home state and subsequently engaged in some wrongful act.

Obviously, this loosens the due process protection afforded defendants beyond anything allowed by the Supreme Court, which recently reemphasized that personal jurisdiction is not an outmoded legal fiction, but remains a vital part of due process and fair play. *See J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011) (striking down the New Jersey Supreme Court's broad ruling that a state court had personal jurisdiction over a company despite the defendant's lack

of minimum contacts with the state.) As the plurality noted, "[f]reeform notions of fundamental fairness divorced from traditional practice" do not give a state lawful judicial authority over a defendant, *id.* at 2787; *see also id.* at 2791 (Breyer, J., concurring in the judgment) (rejecting the state court's adoption of "a broad understanding of the scope of personal jurisdiction based on its view that '[t]he increasingly fast-paced globalization of the world economy has removed national borders as barriers to trade' " (alteration in original) (quoting 987 A.2d 575, 577 (N.J. 2010)).

The majority's decision today unwisely broadens the scope of personal jurisdiction, erroneously rejects the district court's adherence to "traditional practice" in favor of its own "[f]reeform notions" of fairness, *id.* at 2787 (plurality opinion), and holds that Walden is subject to the jurisdiction of a Nevada court despite his having no contacts whatsoever to that state in connection with plaintiffs' Fourth Amendment claim. Because "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter," *id.*, I dissent.

## Postscript

The majority's postscript to the opinion amplifies the error of the opinion in two ways. First, it expands the meaning of a "claim" for purposes of personal jurisdiction. Second, it completes the opinion's evisceration of the test for purposeful direction. Together, these changes signal that the traditional due process limitations on a court's authority to assert personal jurisdiction over an out-of-state defendant no longer pose any meaningful constraint on courts in the Ninth Circuit.

## A

In its most recent changes, the majority continues its search for a theory to save the plaintiffs' complaint. The original opinion's personal jurisdiction analysis relied entirely on the

false affidavit "aspect" of plaintiffs' complaint. Maj. op. at 8955, 8957, 8965. According to the majority, this aspect "amounted to an attempt to defraud" Fiore and Gipson. Maj. op. at 8973. Under the pressure of an en banc call, the majority has promoted this false affidavit and fraud "aspect" of the complaint to a full-blown cause of action for the "continued seizure" of plaintiffs' funds "in violation of the Fourth Amendment." Maj. op. at 8978. Because this is "arguabl[y]" a cause of action, the majority's amended opinion now asserts that personal jurisdiction may be derived from this newly identified claim. Maj. op. at 8956 n. 17.

This is a dramatic and unjustified shift. Until the majority's postscript, no one involved in the litigation—not the plaintiffs, the defendant, or any court—had read the complaint as containing two separate Fourth Amendment claims. Neither plaintiffs' briefs nor their arguments before this court or the district court raised any such theory. Rather, plaintiffs argued that the court had personal jurisdiction over Walden based on the single claim they actually pled: Walden's initial seizure of funds at the airport. Nothing was mentioned about a "continued seizure." And with good reason: no court has ever given an indication that a *Bivens* claim for a "continued seizure" even exists.[6] Naturally, Walden never challenged an argument not made.

---

[6] Three circuits have squarely considered and rejected the theory that "continued seizures" violate the Fourth Amendment. *See Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 660 (7th Cir. 2012) ("[C]ontinued retention of unlawfully seized property is not a separate Fourth Amendment wrong."); *Lee v. City of Chicago*, 330 F.3d 456, 461-66 (7th Cir. 2003); *Fox v. Van Oosterum*, 176 F.3d 342, 351-52 (6th Cir. 1999); *United States v. Jakobetz*, 955 F.2d 786, 802 (2d Cir. 1992). Moreover, as the Supreme Court has recently reiterated, courts should be extremely cautious about extending Bivens to new constitutional claims. *See Minneci v. Pollard*, 132 S. Ct. 617, 620 (2012) (refusing to imply a *Bivens* action for Eight Amendment violations by employees of a privately operated federal prison); *id.* at 622 (noting that the Court has not implied a new *Bivens* action since 1980).

But now, after the appeal, its published opinion, and the en banc proceedings, the majority has changed the rules of the game. Under the majority's new theory, a court can rest its personal jurisdiction holding on any factual allegation in a complaint that a court deems to "arguably" create a cause of action—whether actually argued by the plaintiff or not. A "claim" can be "arguable" even though no court has ever recognized it, and it can be discovered by the court sua sponte at any stage in the litigation, including during en banc proceedings. This unbounded approach will impose enormous costs on litigants and state courts, both of whom must now bear the burden of scouring complaints in order to divine the personal jurisdiction implications of each and every factual allegation.

B

In addition to expanding what it means to be a "claim" for purposes of personal jurisdiction, the majority's postscript comes close to erasing whatever is left of the Ninth Circuit's test for determining whether that "claim" supports specific personal jurisdiction. *See* J. McKeown dissent from denial at 8943-45; J. O'Scannlain dissent from denial at 8934-35.

The Supreme Court has "consistently held" that a state court cannot assert personal jurisdiction over a defendant merely because it is foreseeable that the defendant's actions could cause an injury in that state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Rather, "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *J. McIntyre Machinery*, 131 S. Ct. at 2789. In order to give rise to personal jurisdiction, these actions must be "expressly aimed" at the forum state. *Calder*, 465 U.S. at 789.

Our cases have eroded this requirement. For example, in *CE Distribution, LLC v. New Sensor Corp.*, we held that a defendant's actions in New Jersey were expressly aimed at

Arizona because "it is reasonable to infer that [defendant] had every reason to know that the effect of the [New Jersey transactions] would resonate in Arizona." 380 F.3d 1107, 1111 (9th Cir. 2004). We went even further in *Brayton Purcell LLP v. Recordon & Recordon*, where we held that the defendant law firm "individually targeted" plaintiff's law firm in one forum by publishing plaintiff's copyrighted online marketing material in a different forum. 606 F.3d 1124, 1129-30 (9th Cir. 2010). But, as Judge Reinhardt pointed out in dissent, the allegedly infringing material was aimed solely at prospective clients in the defendant's own district, where its lawyers "practiced exclusively." *Id.* at 1132 (Reinhardt, J., dissenting). Despite the fact that such behavior "is quite the opposite of 'directly targeting the forum,' " *id.*, we held that it was sufficient "express aiming" to support personal jurisdiction.

This case deals the coup de grace to any semblance of compliance with Supreme Court precedent. *See* J. O'Scannlain dissent from denial at 8934-35. Under the majority's logic, a court can rely on any allegation that the defendant committed a wrongful act at a time when the defendant should have known that plaintiffs had "strong connections" with a state. Maj. op. at 8980. The complaint need not allege a wrongful act that is legally cognizable, maj. op. at 8956 n. 17, or even that defendant actually knew of plaintiffs' connections to the forum state at the time the defendant committed the allegedly wrongful act, maj. op. at 8959. Rather, all that is needed is the allegation that some intentional act by the defendant has a foreseeable effect on a plaintiff in another state. In other words, as Judge McKeown correctly observes in her dissent from the denial of rehearing en banc, we have adopted the exact foreseeability framework that the Supreme Court has consistently rejected. *See* J. McKeown dissent from denial at 8943-45.

This impermissible expansion of personal jurisdiction has substantial consequences. For one thing, federal officials working in a transportation hub who are sued by disgruntled

travelers can now be forced to litigate in any traveler's home state. A court has personal jurisdiction over such an official so long as (1) it can infer that the official had reason to know the traveler's residence at some point during the litigation, and (2) it can discern some "arguable" cause of action in the traveler's complaint. Under such a "test," a TSA official in Minneapolis who stopped a traveler on a no-fly list can be forced to litigate a claimed equal protection violation in the traveler's home town, whether in Pocatello or Anchorage.

In short, there are no effective limits to the majority's reasoning: all the airport officials who interacted with Fiore and Gipson in Atlanta have potentially subjected themselves to the judicial power of Nevada. This essentially reduces the showing of personal jurisdiction to a pleading exercise and, by doing so, grants state courts in the Ninth Circuit an unconstrained power to "bind strangers to the State." *J. McIntyre Machinery*, 131 S. Ct. at 2787. This not only flouts common sense, but also ignores the Supreme Court's recent recognition that personal jurisdiction continues to play a vital role in defending basic fairness and due process. *See id.* at 2786-87.

Judges O'Scannlain, McKeown, and I are not the first to decry this lamentable development in our case law. *See, e.g.*, *Brayton Purcell*, 606 F.3d at 1131-32 (Reinhardt, J., dissenting from the majority's application of the express aiming requirement); *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1224-25 (9th Cir. 2006) (en banc) (Ferguson, J., dissenting from the same, joined by O'Scannlain, J., Tashima, J.). But there is even more to lament today, as the majority has done significant further damage to the "traditional notions of fair play and substantial justice" guarded by the long-established rules of personal jurisdiction. *Int'l Shoe*, 326 U.S. at 316.